1  ROTHWELL FIGG ERNST & MANBECK, P.C.
Christopher Ott (CA Bar No. 235659)
2  cott@rothwellfigg.com
16501 Los Barbos
3  Rancho Santa Fe, CA 92067
(202) 783-6040
4
Leo M. Loughlin (pro hac vice)
5  (DC Bar No. 474963)
(lloughlin@rfem.com)
6  Jennifer Maisel (pro hac vice)
(DC Bar No. 1025637)
7  (jmaisel@rfem.com)
Rachel Echols (pro hac vice)
8  (DC Bar No. 991630)
rechols@rfem.com
9  Caitlin M. Wilmot (pro hac vice to be filed)
(DC Bar No. 241246)
10  (cwilmot@rfem.com)
Dylan Haversack (pro hac vice to be filed)
11  (VA Bar No. 95814)
(dhaversack@rfem.com)
12
13  Jennifer A. Golinveaux (SBN 203056)
jgolinveaux@winston.com
14  Irina V. Lyapis (SBN 298723)
ilyapis@winston.com
15  **WINSTON & STRAWN LLP**
101 California Street, 35th Floor
16  San Francisco, CA  94111-5840
Telephone:        (415) 591-1000
17  Facsimile:        (415) 591-1400
18  David Enzminger
DEnzminger@winston.com
19  **Winston & Strawn LLP**
333 South Grand Avenue, 38th Floor
20  Los Angeles, CA  90071-1543
Telephone:        (213) 615-1700
21  Facsimile:        (213) 615-1750
22  *Attorneys for Plaintiff*
23
24  **UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**
25
26
27  VLAD ZAMFIR                          Case No. 3:21-cv-00474-TWR-AHG

                         Plaintiff,        **SECOND AMENDED COMPLAINT FOR**
28                                          **TRADEMARK INFRINGEMENT:FALSE**

1       v.

2

3  CASPERLABS, LLC,

4              Defendant.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DESIGNATION OF ORIGIN; UNFAIR COMPETITION; TRADEMARK CANCELLATION; FRAUD BY INTENTIONAL MISREPRESENTATION** Cal. Civ. C. §§ 1709, 1710; AND CALIFORNIA BUS. & PROF. CODE §17200 UNFAIR COMPETITION

**DEMAND FOR A JURY TRIAL**

Original Complaint Filed: March 17, 2021

2

Plaintiff Vlad Zamfir ("Mr. Zamfir" or "Plaintiff"), by and through the undersigned counsel, files this Second Amended Complaint and Demand for Jury Trial against Defendant, CasperLabs, LLC ("CasperLabs" or "Defendant"), and hereby alleges as follows:

## NATURE OF THE ACTION

1.      Mr. Zamfir is a prominent researcher in the blockchain community and developed a seminal correct-by-construction ("CBC") proof-of-stake ("PoS") blockchain consensus protocol.  Around March 2015, Mr. Zamfir adopted the name "Casper" for his research and development of the PoS protocol.  On November 2, 2017, Mr. Zamfir released a first draft version of the CBC Casper PoS protocol, and by December 2018, Mr. Zamfir published the CBC Casper protocol 1.0 specification. Accordingly, Mr. Zamfir is often credited as being the "Face of Casper."  In October 2019, CasperLabs released a specification for a PoS blockchain architecture based on Mr. Zamfir's original Casper CBC specification, which it called the "Highway" protocol.  This action arises primarily from CasperLabs' recent activities, beginning on or about August 2020, to instead use the name "Casper" to describe its PoS protocol and for filing for federal registration of the CASPER mark.

2.      This civil action includes claims for trademark infringement, false designation of origin, and unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),  for the substantial and related claims of trademark infringement and unfair competition under the common law of California, for Unfair Business Practices (Cal. Bus. & Prof. C. § 17200, et. seq.), and fraud by intentional misrepresentation (Cal. Civ. C. §§ 1709, 1710), all arising from the Defendant's improper registration and use of the Casper name (and related terms "Casper network," "Casper protocol," "Casper blockchain," and "CSPR") in connection with the marketing, advertising, promotion, offering for sale, and/or sale of Defendant's PoS blockchain network.

3.      Plaintiff's false designation, unfair competition, and trademark claims are based on Defendant's use in commerce of the Casper name, despite having no right to do so, causing confusion in the market and damage to Plaintiff, and Plaintiff's fraud by intentional misrepresentation claim is based upon Defendant's fraudulent misrepresentation to Mr. Zamfir that it would register the CASPER mark on his behalf, while instead registering and keeping it for itself.

4.      Plaintiff seeks injunctive relief, cancellation of U.S. Trademark Registration Nos. 6202402 and 6131157, abandonment of pending U.S. Trademark Application Serial No. 88603814, and monetary relief.

**THE PARTIES**

5.      Plaintiff Vlad Zamfir is an individual, residing at 79 Hemlo Cres, Ottawa, ON K2T1E1.  Mr. Zamfir is a citizen of Canada.

6.      Mr. Zamfir has been, and continues to be, an innovator and prominent researcher in blockchain technology.  He has conducted cutting edge research and developed a novel proof-of-stake consensus protocol, enabling more secure peer-to-peer networks and solving widely-recognized issues with malicious miners.  Mr. Zamfir has spent considerable time, effort, and money developing his PoS protocol and sharing his research with the crypto industry.

7.      Upon information and belief, Defendant CasperLabs is incorporated under the laws of Wyoming, and has a principal place of business at 11440 West Bernardo Court, Suite 300, San Diego, CA 92127.  CasperLabs, LLC is a subsidiary of CasperLabs AG, a Swiss corporation that does business under the name of CasperLabs, LLC.  CasperLabs AG is the sole member of CasperLabs, LLC.

8.      Upon information and belief, Defendant CasperLabs is engaged in the development of blockchain technology and an open-source proof-of-stake blockchain network.

2

**JURISDICTION AND VENUE**

9.      This action arises under the trademark laws of the United States, Title 15 of the United States Code.  This court has jurisdiction over this action pursuant to 15 U.S.C. § 1125, 28 U.S.C. §§ 1331 and 1338(a) and (b), and pursuant to the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1), in that Defendant resides in this district.

11.     On information and belief, Defendant CasperLabs is subject to personal jurisdiction in this district by virtue of its presence in this State, having its principal place of business in this judicial district, having conducted business in this State, having availed itself of the rights and benefits of California laws such that it should reasonably anticipate being hauled into court in this judicial district, having engaged in systematic and continuous contacts with the State of California, and in particular within this judicial district, and from the receipt of substantial revenue from activities conducted in this state and in this judicial district.

**FACTS**

**Blockchain Background**

12.     In simple terms, a blockchain is a distributed protocol that stores transactional records as a chain of "blocks."  Each block contains a cryptographic fingerprint, called a hash, of the previous block, a timestamp, and other data.  Once a block is recorded to the chain, it cannot be altered retroactively without leaving evidence of the alteration by breaking the hash chain.

13.     Cryptocurrency protocols, like Bitcoin and Ethereum, leverage blockchain technology to secure peer-to-peer networks without relying on any single legal entity to own or administer the network.

14.     Certain types of blockchain applications, such as those used for cryptocurrency exchanges, rely on consensus protocols to validate the operation of

3

the applications.  Historically, these blockchain-based cryptocurrencies have relied on a "proof of work" ("PoW") consensus mechanism to secure the network.  PoW requires that "miners" run computationally intensive cryptographic programs to show that they are devoting a lot of computational power in order to produce a "winning block," which is basically a block with low enough odds of being mined.  A tremendous amount of electrical energy and microchip manufacturing has been devoted to mining in order to secure PoW protocols, because miners earn cryptocurrency in exchange for producing blocks.  PoW protocols have been widely criticized for their outsized consumption of computational and electrical energy.  Sustainability and workability of this consensus mechanism has been seriously questioned by the industry and general public.  Therefore, much of the technical development in the blockchain industry has been devoted to the development of alternative consensus mechanism.

15.    Thus, an alternative to PoW, called "proof-of-stake" ("PoS"), has been under research in the blockchain and cryptocurrency industry for over five years.  It promises to eliminate the computational waste inherent to PoW.  PoS uses digital resources as opposed to computational resources to create barriers to attacking the blockchain network.

### Mr. Zamfir's Development of the Casper Protocol

16.    Mr. Zamfir is a well-known and respected researcher of cryptoeconomics and distributed systems.  In particular, Mr. Zamfir is one of the two lead researchers of Casper PoS blockchain protocols.  The other lead researcher associated with Casper is Vitalik Buterin, founder of Ethereum.

17.    Blockchain technology is new and emergent, and consensus protocol mechanisms for blockchain-based cryptocurrencies cover a novel area of technical research.  Therefore, only a few individuals are considered to be competent in this nascent field.  Mr. Zamfir is recognized as one of the lead researchers in the

4

blockchain industry.  As someone with deep background and expertise in this field, Mr. Zamfir considers it his duty to steward technical research and public education in blockchain technology in a responsible manner.

18.     Around 2014, Mr. Zamfir began researching and developing a new PoS blockchain protocol design in conjunction with Vitalik Buterin and the Ethereum Foundation, a non-profit organization dedicated to supporting the Ethereum open-source blockchain platform through development, research, and education.

19.     Around March 2015, Mr. Zamfir adopted the name "Casper" for his research and development of a new PoS protocol, which was attempted parodied adaptation of the name of an existing protocol at that time, referred to as GHOST, for PoS with incentive mechanism design for oligopolistic markets.

20.     The new PoS protocol design research conducted by Messrs. Zamfir and Buterin made it clear that there was a need to create a formal specification for a consensus protocol, and thus Messrs. Zamfir and Buterin took their research into distributed systems in two separate directions.  Mr. Zamfir's branch of this research became known as "CBC Casper," which refers to correct-by-construction ("CBC") software design methodology.  The branch of research conducted by Mr. Buterin became known as "Casper the Friendly Finality Gadget" ("FFG").  Messrs. Zamfir and Buterin have been jointly conducting this research since 2015 in connection with the much-anticipated, and much-publicized slated release of the Casper PoS protocol for the Ethereum protocol mainnet.  Mr. Buterin's branch of Casper research is now marketed under the name "Ethereum 2.0."  Mr. Zamfir's branch, CBC Casper, is currently known and referred to throughout the industry and consuming public as "Casper."

5

### Mr. Zamfir's Use of the Casper Trademark in Commerce

21.     Mr. Zamfir has been conducting research and development under the Casper name around the world, and in particular, in the United States, continuously, since at least as early as March 2015.

22.     For example, from 2015 to present day, Mr. Zamfir has used and continues to use the Casper name when communicating and advocating for the adoption of his PoS blockchain research with technical professionals, investors, and fellow researchers and developers within the Ethereum community and blockchain industry around the globe.

23.     Mr. Zamfir uses the CBC Casper and Casper name exclusively when communicating his work on PoS and distributed systems to the wider public via Twitter, Github, and his personal blogs.  Currently, Mr. Zamfir has over 67.3 thousand followers on Twitter.

24.     Mr. Zamfir's Casper name is distinctive to both the consuming public and his tradecraft.

25.     On August 1, 2015, Mr. Zamfir published a post on the Ethereum Foundation blog titled "Introducing Casper 'the Friendly Ghost.'"  Ex. A.  The blog post states that "Casper is a security-deposit based economic consensus protocol," and notifies readers that they "can looking forward to seeing simulations, informal and formal specification, formal verifications, and implementations of Casper!"  *Id*.

26.     By 2017, Mr. Zamfir used the Casper mark in commerce in connection with distributing downloadable Casper CBC software and specifications under open source licensing agreements in the United States.  For example, Mr. Zamfir published his CBC Casper software and specifications on GitHub.  GitHub is a global platform provided by GitHub, Inc., a company located in San Francisco, California, that allows developers and companies to build, ship, and maintain software.  GitHub currently has over 65 million developers, 200 million repositories, and is widely accessible to

6

consumers in the United States.  Ex. B.  For example, Mr. Zamfir's Casper CBC software and specifications were published under several folders on GitHub, including cbc/casper; vladzamfir/cbc_casper; and ethereum/cbc-casper.

27.    By March 2017, Mr. Zamfir published the first formal verification of CBC Casper on GitHub, which was and remains available to download by anyone in the United States at https://github.com/pirapira/cbc_casper and https://github.com/vladzamfir/cbc_casper.  Exs. C-D.

28.    By November 2017, Mr. Zamfir and the Ethereum research group released a software prototype of Casper on GitHub, which was and remains available to download by anyone in the United States at https://github.com/ethereum/cbc-casper/releases.  Ex. E.  The Casper release is subject to the GNU Affero General Public License, an open source license designed to permit other developers to widely adopt and build upon the Casper protocol specification.  Ex. F.  A "readme" file accompanying the code describes the release as "Casper CBC," a "python implementation of a class of ["correct-by-construction" consensus protocols]," which "includes Casper the Friendly Ghost (a blockchain consensus protocol) and Casper the Friendly Binary Consensus Protocol."  Ex. G.  Casper version 0.2.0 was released on January 24, 2018, and versions 0.3.0 and 0.3.1 were released on April 27, 2018.

29.    On December 18, 2017, Mr. Zamfir uploaded to GitHub a draft CBC Casper protocol specification titled "Casper the Friendly Ghost  A 'Correct-by-Construction' Blockchain Consensus Protocol."  Ex. H.  The paper notes that "[e]arly prototypes of both Casper the Friendly Binary Consensus and Casper the Friendly Ghost have been implemented," and cites to the source code available for download at GitHub at https://github.com/ethereum/cbc-casper.  *Id*., p. 13.

30.    Mr. Zamfir has substantially benefitted from the creation and distribution of the CBC Casper software, specification, and protocol under open source licenses throughout the United States.  These benefits include economic

7

benefits, such as generating market share, promoting international recognition, and obtaining free improvements to CBC Casper.

31.   Moreover, since at least 2015, and continuously through present day, Mr. Zamfir has provided blockchain technology consulting services using the Casper trademark in the United States.  For example, Mr. Zamfir has used the Casper trademark in connection with the sale or advertising of consulting services to support implementation of the Casper CBC protocol in commercial products and services offered in the United States. *See, e.g.*, Exs. I-J.

32.   In addition to his work with the Ethereum foundation, Mr. Zamfir served as a Director with the RChain Cooperative, led by Greg Meredith and headquartered in Seattle Washington, to implement a blockchain platform based on his Casper CBC protocol specification.  Mr. Zamfir was quoted in a September 22, 2017, press release stating:

> I'm satisfied that research Greg Meredith and I have done on Casper and sharding over the last couple of years has been foundational to the RChain ecosystem.  I believe in our results and in the formal methods that make them easily defensible. . .  I'll (of course) continue to contribute to the open-source/public domain development of Casper and sharding through ongoing research, independently and as a contractor for the Ethereum Foundation.

Ex. K.  Mr. Zamfir joined RChain as a Board Director as the Co-op neared the conclusion of its private token sale in September 2017.  *Id.;* Ex. L.  The RChain blockchain is known as the first implementation of the CBC Casper consensus algorithm.  *See* Ex. M.

33.   Mr. Zamfir has also marketed his CBC Casper development and consulting services using the Casper trademark in connection with seminars, conferences, workshops, and lectures on blockchain research in the United States. For example, Mr. Zamfir presented on "Cryptoeconomics in Casper" at the Crypto Economics Security Conference on October 3, 2017, at University of California,

8

Berkeley. This presentation and several others have been uploaded to YouTube and other online video platforms, with thousands of views.

34.     Additional presentations by Mr. Zamfir in the United States, through which he marketed his research and consulting services under the Casper name include:

a.    "Upgrading Ethereum: Casper and Sharding," at NYC Ethereum Enthusiasts (May 2016, New York).

b.   "Proof of Stake Panel," at Silicon Valley Ethereum Meetup (October 25, 2016, California).

c.   "Discussing Casper," at Construct 2017 (January 2017, San Francisco, California).

d.   "Security and Consideration of the Casper Protocol," at Blockchain Protocol Analysis and Security Engineering ("BPASE") 17 at Stanford University (January 27, 2017, California).

e.   "Upgrading Casper and Sharding," at NYC Ethereum (July 1, 2017, New York).

f.   "Demo of CBC Casper with LMD Ghost," at IC3 Bootcamp at Cornell University (July 13-19, 2017, New York).

35.     Mr. Zamfir received compensation for several of his presentations on Casper.  *See, e.g.*, Ex. N.  Mr. Zamfir's Casper name and his research on proof-of-stake protocols offered thereunder have received significant coverage in various media, including at least the following:

a.   A 2017 Bloomberg piece ("And one man, Vlad Zamfir, has a plan to fix it. This week, Bloomberg's Matthew Leising and Brad Stone speak to Zamfir about his big dreams for Ethereum and how his project (codenamed **Casper**) could pave the way for masses of ordinary internet users to join in the craze.") (emphasis added).

9

b.  Recognition in a 2018 article in The New Yorker ("Zamfir is the lead developer of one strand of **Casper**, an ongoing software upgrade designed to make Ethereum scale better and work more securely.") (emphasis added).

c.  He was named one of the 100 Most Influential People in Crypto, 2020 Edition, by CryptoWeekly for his work on proof-of-stake.

d.  Blockchain community blogsite, Blockgeeks, has stated "Vlad Zamfir is often credited as being the '**Face of Casper**.'" (emphasis added)

36.  As a result of his work, the Casper name has come to signify the high quality and singular nature of Mr. Zamfir's research, development, and design of the blockchain PoS consensus protocol designated by the Casper name.  The Casper name has acquired irreplaceable distinction, reputation, and goodwill.

## Mr. Zamfir and CasperLabs

37.  Around November or December of 2018, Mr. Zamfir was approached by CasperLabs after Devcon, the yearly Ethereum developer conference, about collaborating on the research and development of a new blockchain.  The proposal centered on the adoption of Mr. Zamfir's version of CBC Casper PoS protocol, which at that time was implemented as a fork of RChain (a "fork" is a separate derivative software repository with independent administration), which he was made to expect would honour RChain's token holders with genesis token distributions.

38.  As part of this proposed collaboration, Mr. Zamfir understood that he would have two roles at CasperLabs: (1) as lead consensus protocol architect; and (2) to serve on the governance committee and to speak with outside investors and present the protocol.  In return for his fulfillment of these roles and duties, CasperLabs promised to financially sponsor much of Mr. Zamfir's blockchain research on Casper.

39.  On February 14, 2019, on behalf of himself and his company, Coordination Technology, Ltd. (CoorTech), Mr. Zamfir entered into a Research

10

Agreement with CasperLabs, setting forth specific terms by which he would provide research, analysis, and advice relating to CBC Casper to CasperLabs to integrate into its proposed blockchain.  The Research Agreement acknowledges that Mr. Zamfir is "a highly recognized thought leader in the world-wide blockchain community with an expertise in blockchain consensus protocols, sharding and governance," and that he had been and was "presently doing work related to a family of proof-of-stake consensus protocols, known as 'CBC Casper' and Casper compliant composite sharding."

40.     CasperLabs was also interested in using Mr. Zamfir's name and image to promote the collaboration, and in connection with CasperLabs' business, products, and services.  On the same day, February 14, 2019, on behalf of his company CoorTech, Mr. Zamfir entered into a Licensing Agreement with CasperLabs, Ltd., granting CasperLabs limited rights in the use of his name and image.  As part of the Licensing Agreement, CasperLabs agreed to provide fundraising services and to source and close donations from third parties, free of charge, to fund Mr. Zamfir's work on CBC Casper.

41.     Within just a few months of the start of their working engagement, it became apparent to Mr. Zamfir that CasperLabs was acting in violation of the terms of the contract.  CasperLabs acted too much in leveraging his name and image in branding their company and too little to fund the CBC Casper research agenda. For example, CasperLabs published press releases using Mr. Zamfir's name and likeness without Mr. Zamfir's consent in violation of the terms of the contract.  Additionally, CasperLabs did not perform its contractual promises to provide research funding to Mr. Zamfir. There were multiple architecture deviations on the technology development side with Mr. Zamfir even providing CasperLabs with adequate additional research and support sufficient to allow CasperLabs to faithfully

11

1  implement the CBC Casper architecture, but CasperLabs continued to be more
2  interested in marketing than in the technology.

3       42.    Specifically, Mr. Zamfir became concerned that CasperLabs was
4  misappropriating his name and falsely asserting affiliations with him in a manner that
5  was misleading CasperLabs' investors and the public at large for the purpose of
6  taking advantage of Mr. Zamfir and his reputation.

7       43.    Already in a strained relationship with CasperLabs, Mr. Zamfir decided
8  to end his relationship with CasperLabs after yet another press release was published
9  without his prior consent, and in light of the complete lack of agreed-upon funding
10 for technical research and development for CBC Casper, putting Mr. Zamfir's
11 operation at risk.

12      44.    On September 11, 2019, Mr. Zamfir sent notice to CasperLabs that
13 CoorTech was terminating both the Research Agreement and the License Agreement.
14 He terminated the License Agreement in October 2019.  Mr. Zamfir agreed to extend
15 the Research Agreement until November 2, 2019, to buy time for a negotiation and
16 clarification of terms.  But when that process proved to be unfruitful, Mr. Zamfir did
17 not extend the Research Agreement further.

18      45.    In or about June 2020, approximately nine months after their relationship
19 with Mr. Zamfir ended, CasperLabs posted documentation explaining their supposed
20 implementation of the Casper protocol.  In that documentation they stated that "[t]his
21 protocol is built on Vlad Zamfir's correct-by-construction (CBC) Casper research."
22 In fact, the Defendant has not adequately deployed Mr. Zamfir's CBC Casper
23 protocol.

24      46.    As of the filing of this lawsuit in March 2021, CasperLabs' website still
25 falsely associated CasperLabs' Casper products and services with Mr. Zamfir and his
26 Casper products and services:

27  • "CBC Casper is a family of consensus algorithms ***developed by Vlad Zamfir***."

28

12

- "We present the design for a new Turing-complete smart contract platform, backed by a Proof of Stake (PoS) consensus algorithm, and WebAssembly (Wasm).  The intent is for this design to be implemented as a new permissionless, decentralized, public blockchain.  *The consensus protocol is built on Vlad Zamfir's correct-by-construction (CBC) Casper work*.  Here, we describe The Highway Protocol, a member of the CBC Casper family which is provably safe and live under partial synchrony. . ."

- "Casper operates using a Proof-of-Stake consensus mechanism per the Highway Protocol, *which is a specification of Correct-by-Construction Casper (CBC Casper)*."

- "The consensus layer of our platform runs on the Highway *flavor of CBC-Casper*."

- "Casper is an open-source Proof-of-Stake blockchain network *built off the CBC (Correct-by-Construction) Casper specification originally established by early Ethereum developers*."

- "Dec 2018: CBC Casper protocol 1.0 specification (Ethereum research group, *Vlad Zamfir*)" and "Sep 2019: Highway Protocol (Daniel Kane, *Vlad Zamfir*, Andreas Fackler)"

47.     Since terminating the License Agreement in October 2019 and the Research Agreement in November 2019, Mr. Zamfir has not had any research or business relationship with CasperLabs, its affiliated entities, nor has he worked on any of CasperLabs' products or services.

48.     While CoorTech, Mr. Zamfir's company, still maintains some beneficial ownership in CasperLabs due to a lack of credible selling opportunities, Mr. Zamfir has no control of the company or their actions.

13

49.     There has been irreparable harm and damage to the Casper name and to Mr. Zamfir's and the broader blockchain research ecosystem due to CasperLabs' misappropriation and misuse of the Casper name.

**CasperLabs' Misappropriation of the Casper Name and Intentional Misrepresentations**

50.     Throughout the duration of the collaboration, CasperLabs did not have a name for its PoS protocol.  CasperLabs had, on several occasions, asked for Mr. Zamfir's permission to use the name "Casper" for its protocol "mainnet" and token, but Mr. Zamfir refused to give his consent.

51.     Mr. Zamfir made clear to CasperLabs that the "Casper" name should not be used to describe any of CasperLabs' planned blockchain releases, but instead should be used technically to refer only to his PoS consensus protocol research.  For example, when Mr. Zamfir objected to calling the token "Casper," CasperLabs used "CLX" as a placeholder for the name of the token (the "CL" for CasperLabs and the "X" for indicating an exchange), with ongoing discussions about a new name.

52.     On October 31, 2019, CasperLabs released a protocol specification that extends CBC Casper with a module for "liveness."  The module was initially conceptualized and developed during the course of the collaboration by Daniel Kane. While Mr. Zamfir was working with CasperLabs, the extension was called "Highway Protocol."  CasperLabs later started calling this product "CasperLabs Highway Protocol," and then "Casper Highway Protocol" as part of their rebranding strategy.

53.     By August 2020, however, in anticipation of its upcoming network launch and coin sale scheduled for March 23, 2021, CasperLabs began referring to its blockchain protocol and token as "Casper."

54.     For instance, on August 31, 2020, CasperLabs' website announced the network launch and token sale, referring to its offering as "[t]he Casper public network and token sale," and referring to its blockchain network as simply "Casper."

14

55.     As the date of sale approached, CasperLabs only increased its efforts at rebranding its project by misappropriating the "Casper" name, either alone or in combination with other terms, such as "Casper network," "Casper protocol," "Casper Highway Protocol," and "Casper blockchain."

56.     For instance, as of the date of the Original Complaint, on its homepage, casperlabs.io, CasperLabs claimed to "develop[] and maintain[] Casper," and encouraged website visitors to "[m]eet Casper" through an introductory video or to "learn more about Casper" on it developer page.  In each instance, "Casper" is used in reference to its blockchain product and service offerings.  A screenshot of its homepage, as of March 2021, is set forth below.



57.     As part of its strategic, wholesale rebranding in August 2020, CasperLabs also developed a webpage designated to the network itself, using "Casper" logos and the acronym "CSPR" to refer to the token coins to be offered for sale on the cryptocurrency platform.  A March 2021 screenshot of the Casper network page is set forth below.



58.     There have been numerous instances of people confusing the launch with Mr. Zamfir, questioning whether or not he was involved.

59.     In addition to using the Casper name in its marketing and advertising of its blockchain technology without Mr. Zamfir's consent, CasperLabs has gone several steps further and improperly sought to obtain ownership of the trademark with a registration of the mark CASPER in its own name, despite the fact that in the industry, it is still used almost exclusively to refer to Mr. Zamfir's PoS consensus protocol research. During the summer of 2019, Mr. Zamfir had several discussions

16

1   with CasperLabs concerning its use and registration of the CASPER mark.  He was

2   not willing to compromise on his refusal to allow "Casper" to be used as a name for

3   CasperLabs' blockchain network.

4        60.      As part of those discussions, in a July 9, 2019 communication between

5   Scott Walker, at the time the Managing Director of CasperLabs, Mrinal Manohar,

6   CEO and Co-founder of CasperLabs, Varun Gupta, General Counsel of CasperLabs,

7   Medha Parlikar, Co-Founder and CTO of CasperLabs, Steven Nerayoff, former

8   Chairman of ADAPtive Holdings, parent company of CasperLabs,  and Plaintiff's

9   agent and consultant, Alessandro Daliana and Vlad Zamfir, Mr. Daliana explained to

10  Mr. Walker that, while he was discussing Defendant's proposal with Mr. Zamfir,

11  Plaintiff "cannot get past [Defendant's] intention to use the name 'Casper'. If we

12  cannot agree on another name there is no point discussing the rest of the document."

13  In response, Mr. Walker acknowledged that "I know there is a lot of push back on the

14  name. We have lots of names that are NOT 'Casper' it will affect the incentive

15  structure but obviously we know we cannot fit a square peg into a round hole..[sic]"

16  A true and correct copy of that communication is depicted here:

17

18

19

20

21

22

23

24



25       61.      On the very next day, July 10th, 2019, following further discussion, Mr.

26  Walker represented to Mr. Daliana on the same communication chain, that Defendant

27  would try to get the Casper trademark "set up and done for CoorTech [Mr. Zamfir's

28

<div align="center">17</div>

1  company].” Specifically, Mr. Walker said that “Varun”, referring to Varun Gupta
2  CasperLabs’ General Counsel, was leading the efforts to secure the CASPER
3  trademark for CoorTech, Zamfir’s company, although he cautioned that “Casper is
4  going to be very tough to trademark for numerous reasons.” A true and correct copy
5  of that communication is depicted here:



> **Scott Walker**
> @aDaliana Thanks for the call today. Very helpful. Here are our initial notes and updates:
>
> 1. Varun is leading the follow up on trying to get “Casper” trademark set up and done for CoorTech. He will be in touch with you via email so you (and of course Vlad) can see the real-time updates on what they can and cannot do.. (Casper is going to be very tough to trademark for numerous reasons)
>
> 2. Mrinal and Varun are getting you a much more detailed review of both the Validator sale and the token sale.

62.    Mr. Zamfir relied upon Defendant’s representation that it would register
the CASPER mark on his behalf and, as a consequence of those representations, did
not separately seek registration of the CASPER mark.

63.    In fact, despite Defendant’s representations, and unbeknownst to Mr.
Zamfir, Defendant had already filed to register the CASPERLABS mark in its own
name. CasperLabs had filed the CASPERLABS trademark (Ser. No. 88300598) on
February 13, 2019, for “Downloadable computer software for managing
cryptocurrency transactions using blockchain technology; Downloadable computer
software platforms for developing, building, and operating distributed applications;
Downloadable computer software platforms for blockchains; Downloadable
computer software for use as a cryptocurrency wallet” in International Class 009 and
“Technological consulting in the field of cryptocurrency; Design and development of
computer software for decentralized computing using blockchain technology;

18

Providing on-line non-downloadable computer software for use as a cryptocurrency wallet; Cryptocurrency services, namely, providing on-line non-downloadable computer software for use as a cryptocurrency wallet comprising a digital currency or digital token, incorporating cryptographic protocols, used to operate and build applications and blockchains on a decentralized computer platform and as a method of payment for goods and services" in International Class 042.  The application had only received an Office Action, requesting a minor amendment with respect to the identification of services. On April 30, 2019, the USPTO issued a technical Office Action for the CASPERLABS trademark that only requested an amendment of the identification of services. See Exhibit O for a copy of the Office Action. On July 15, 2019, CasperLabs filed its response to the Office Action with the USPTO and the CASPERLABS application was approved for publication on July 19, 2019.

64.     On August 20, 2019, in a communication chain between Mr. Daliana and Mr. Gupta, Mr. Daliana followed up with Mr. Gupta asking for an update on "the Casper trademark application and its ***assignment to Vlad/Coortech***". In response, Mr. Gupta refers him back to Mr. Walker, but never contested the fact that the Casper mark was intended to be assigned to Coortech. A true and correct copy of this communication is depicted here:

19

65. Despite Defendant's assurances that it would get the "'CASPER' trademark set up and done for Coortech," shortly after Mr. Daliana's inquiry about the status of the Casper trademark application, Defendant instead filed two applications to register the mark in its own name.

66. On September 4, 2019, CasperLabs, LLC filed two trademark applications to register the CASPER mark in its own name for services related to cryptocurrency, U.S. Trademark Application Serial No. 88/979132 for the trademark CASPER in connection with "Technological consulting in the field of cryptocurrency; Design and development of computer software for decentralized computing using blockchain technology; Providing on-line non-downloadable computer software for use as a cryptocurrency wallet; Cryptocurrency services, namely, providing on-line non-downloadable computer software for use as a

20

cryptocurrency wallet comprising a digital currency or digital token, incorporating cryptographic protocols, used to operate and build applications and blockchains on a decentralized computer platform and as a method of payment for goods and services; Data mining, namely, coordinating efforts of a decentralized data scientist network; Providing online non-downloadable computer software for coordinating the data gathering and analyzing efforts of a decentralized data scientist network and for enabling a decentralized data marketplace" in International Class 042. The trademark was registered as Registration No. 6202402 on November 17, 2020, and bears a date of first use of September 4, 2019, and a date of first use in commerce of August 12, 2020.  As proof of their use for Reg. No. 6202402, CasperLabs LLC submitted copies of the Swiss CasperLabs website. CasperLabs, LLC also filed U.S. Trademark Application Serial No. 88603814 for the mark CASPER in connection with "Downloadable computer software for managing cryptocurrency transactions using blockchain technology; Downloadable computer software platforms for developing, building, and operating distributed applications; Downloadable computer software platforms for blockchains; Downloadable computer software for use as a cryptocurrency wallet" in International Class 009 and "Financial services, namely, providing a decentralized and open source cryptocurrency on a global computer network utilizing blockchain technology; Financial services, namely, providing a decentralized and open source cryptocurrency on a global computer network utilizing blockchain technology for use in staking protocols on blockchains; Enabling a decentralized data marketplace, namely, cryptocurrency exchange services and financial brokerage services for cryptocurrency trading" in International Class 036. This application is an intent-to-use application and was filed on September 4, 2019. This application is still pending.

67.     CasperLabs never informed Plaintiff of its registrations of the CASPER or CASPERLABS trademarks, including U.S. Trademark Registration Nos. 6202402 and 6131157, and U.S. Trademark Application Serial No. 88603814.

68.     On February 21, 2020, Mr. Zamfir expressed concern about CasperLabs' ongoing and planned use of the CASPER mark to a controlling shareholder of CasperLabs, who rather than disclosing, continued to conceal CasperLabs' intent to hijack the CASPER mark.

69.     It was not until January 25, 2021, shortly before the filing of this lawsuit, that Plaintiff first learned that CasperLabs had registered the CASPER mark.

70.     As of the date of this pleading, CasperLabs has not assigned either U.S. Trademark Registration No. 6202402 or U.S. Trademark Application Serial No. 88603814, to either Mr. Zamfir or CoorTech, despite their prior representations and agreement.  Both the registration and the pending application currently list CasperLabs, LLC as the owner.  As proof of their use for Reg. No. 6131157, CasperLabs, LLC submitted copies of the Swiss CasperLabs website.

**Confusion and Irreparable Harm**

71.     CasperLabs' use of the Casper name to advertise and market its own blockchain technology products and services, and to promote its blockchain network and coin, are causing and will continue to cause confusion as to the source of the products and services, leading customers to mistakenly believe CasperLabs' products and services are somehow Mr. Zamfir's work or are otherwise associated with him or his company CoorTech.  Furthermore, this interferes with Mr. Zamfir's use of the Casper name in research and development, because it requires resolving ambiguity and phrasing communications in order to avoid unintentionally promoting CasperLabs, and thereby making it harder for Mr. Zamfir to market the genuine products of his research.

22

72.     Mr. Zamfir's name has already been associated with CasperLabs in a way that has been harmful to his reputation.  Mr. Zamfir is regularly contacted by people who are confused about his participation in CasperLabs.  Furthermore, people falsely assume that Mr. Zamfir's ongoing Casper research is for CasperLabs instead of being independent or for Ethereum.  Finally, they are given a false impression that Mr. Zamfir's research is being financed by some relationship with CasperLabs and that the fundamental research for the ecosystem that CBC Casper represents is funded, making it harder for him to secure funding.

73.     Since the March 17, 2021 filing of this lawsuit, several individuals have already explained how they were confused and falsely associated CasperLabs with Plaintiff due to CasperLabs' use of the Casper name.





**Pat Fives** @patfives · 22h
Replying to @VladZamfir
wow crazy. I'd seen the emails from Coinlist and was planning to start research for the sale solely because it's called CasperLabs and I assumed you were running it.

6

**harryhalpin** @harryhalpin · 17h
Well, this is sketchy. I have to admit, I can't figure out what Casper Labs is doing outside on capitalizing on @VladZamfir's reputation and name. They should at least distinguish themselves and perhaps change their names, it just confuses people (including myself!)

> **Vlad Zamfir** @VladZamfir · 17h
> may the history/law of names be true/just🙏
> Show this thread
>
> Attorneys for Plaintiff
>
> UNITED STATES DISTRICT COURT
> SOUTHERN DISTRICT OF CALIFORNIA
>
> VLAD ZAMFIR, Plaintiff, v. CASPERLABS, LLC
>
> Case No. '21CV474 GPC AHG
>
> COMPLAINT FOR VIOLATION OF SECTION 43(A) OF THE LANHAM ACT, 15 U.S.C. § 1125(a), FOR FALSE DESIGNATION OF ORIGIN
>
> DEMAND FOR A JURY TRIAL

3 Tip

**Tobby Kitty** ♦ @TobbyKitty · Mar 18
Replying to @VladZamfir
I just learned there is CasperLabs and they have coins or some stuff.

WTF is this shit? The only Casper is Casper Protocol which carry the banner for only PoS of Ethereum.

Good luck Vlad!

1 5

1
2
3
4
5

**Buzz Lightyear**

> **Casper Official Announcements**
> CasperLabs vigorously disputes the trademark claims made by V...

So Vlad and vitalik created the technology behind casper labs,
they'll created the name. Now casper labs take their ideas and
names and make coin of other people's ideas and work          4:05 PM

6
7
8
9

**Deepak B**

Can u pls clear wat Vlads role was in Casper. I knew he had his
research on Casper.                                            8:54 AM

Ivan

10
11
12
13
14
15

**Ali**

> **Mrinal Manohar**
> Then please do not participate, he is not and will not be part of t...

Hi Mrinal, Vlad Zamfir's name is still in your website. Under
documentation part it says 'The consensus protocol is built on Vlad
Zamfir's correct-by-construction (CBC) Casper work'.

Should you not remove his name from your website if the
mathematical logis is based on Dan's work- Highway Protocol?
                                                              1:39 PM

16
17
18
19

**Jay**

Hi admin - I have a question, i thought Vlad Zamfir was a major part
of Casper labs. and i have just noticed he has left ? what is the
current business relationship you have with him. was he one of the
casperlab founders i have came across this          ↩ 1  5:01 PM

20
21
22
23

**Giamfranco Bottone**

Wasn't vlad the main architect of casper? I though he was working
for you guys.                                                 7:50 AM

24
25
26

**Thom**

Why is Vlad not your adviser anymore? The coindesk article is so
misleading!                                           ↩ 1  7:47 AM

27
28

<div align="center">25</div>

74.     Even the CasperLabs team recognized that using the Casper name to refer to the CasperLabs blockchain technology would create confusion with Mr. Zamfir's prior work.  For instance, in a February 18, 2019, Telegram message discussing use of the Casper name, a member of the CasperLabs team noted that using "Casper for the name of the protocol seems like it will lead to confusion or at least be hard to explain in the long run."  Another team member responded "***I agree, the name carries so much significance today. Vlad is the POS architect after all***." (emphasis added).

75.     Barring intervention, CasperLabs' use of the Casper name will continue to cause damage and immediate irreparable harm to Mr. Zamfir and to his reputation and goodwill within the industry and with the consuming public at large.  This goodwill, accumulated through years of research and development advancing blockchain technology for the benefit of the cryptocurrency market, is critical for his work.

76.     Investors, fellow researchers and developers within the Ethereum and global blockchain communities recognize the Casper name and associate it with the high quality design of Mr. Zamfir's CBC PoS protocol.

77.     Mr. Zamfir has no control over the products released by CasperLabs.  He has no confidence that the products of CasperLabs will meet his technical standards in PoS economics or in distributed system performance and correct-by-construction design.  Defendant is hijacking Mr. Zamfir's work for its own purposes under the Casper trademark, and excluding the actual creator.  Rather than building a truly open blockchain improvement, CasperLabs has formed partnerships that will allow China to deploy the Casper technology.  As announced in a February 11, 2021 interview, CasperLabs is seeking "state-level endorsement" by China of this technology.  *See* https://www.youtube.com/watch?v=T7tsJ_BlYGU (last viewed on June 1, 2021).

26

78.     Mr. Zamfir has faced difficulties securing funding for further research, development, and adoption of CBC Casper due to industry confusion between CasperLabs and Mr. Zamfir, and the provenance of CBC Casper technology due to CasperLabs' unauthorized use of the Casper name.

79.     Upon information and belief, existing clients, including the Ethereum Foundation, forewent providing additional funding to Mr. Zamfir and CoorTech because of industry confusion caused by CasperLabs.

80.     Upon information and belief, existing clients including the Ethereum Foundation forewent promoting Mr. Zamfir's Casper products and services under the Casper name by minimizing references to Casper products and services on their roadmaps and documentation under the Casper name, because of industry confusion caused by CasperLabs.

**CasperLabs' Coin Sale and Mainnet Launch**

81.     On March 23, 2021, CasperLabs launched its initial coin offering ("ICO"), or token sale, of its CSPR coin on CoinList.  The Casper Network Mainnet subsequently launched on March 31, 2021.

82.     CasperLabs' Casper Highway protocol is a liveness component that specifies how validators reach consensus on transactions on the Casper Network Mainnet.  Unfortunately, the Highway protocol never met Mr. Zamfir's advertised design requirements for CBC Casper, due to, in particular, Highway protocol's unnecessary overhead.

83.     As of the date of this Amended Complaint, public records indicate that CasperLabs engaged in four rounds of initial coin offerings in March and April of 2021, which were called Option 1, Option 2, Option 3, and Option 4.

84.     Performance issues in the technology underlying the Casper Network are likely to be falsely associated with Mr. Zamfir's research and life's work, to his detriment.  Based on CasperLabs' own statements and admissions, CasperLabs has

27

launched its blockchain network and cryptocurrency using the Casper name for a token and blockchain. Mr. Zamfir is neither affiliated with nor endorses CasperLabs' blockchain network and cryptocurrency.  Buyers and investors believed, and still believe these products, to be associated with Mr. Zamfir.

85.   The false association between Defendant's Casper Network and Mr. Zamfir's CBC Casper, is and will continue to cause severe harm to Plaintiff, and specifically, to Mr. Zamfir's reputation and trade. This was the very harm that Mr. Zamfir sought to prevent through a preliminary injunction.

## COUNT 1

### (False Designation of Origin under 15 U.S.C. § 1125(a))

86.   Plaintiff repeats and re-alleges the allegations of Paragraphs 1-85 above, as if fully set forth herein.

87.   Defendant's use in commerce of the Casper name as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Defendant's PoS blockchain network, and is likely to cause consumers to believe, contrary to fact, that Defendant's proof-of-stake blockchain network is sold, authorized, endorsed, or sponsored by Plaintiff, or that Defendant is in some way affiliated with or sponsored by Plaintiff.

88.   Defendant's acts set forth above constitute false designation of origin in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

89.   Defendant's conduct as alleged herein is willful and is intended to cause confusion, mistake, or deception, as to the affiliation, connection, or association of Defendant with Plaintiff.

90.   Defendant's conduct as alleged herein is causing immediate and irreparable harm and injury to Plaintiff, and loss to Plaintiff's goodwill and reputation, and financial loss to Mr. Zamfir, and will continue to both damage

Plaintiff and confuse the public unless enjoined by this court.  There is no adequate remedy at law for the harm caused by the wrongful acts alleged herein.

91.     CasperLabs' unlawful use of the Casper name damages Mr. Zamfir by lessening the marketable value of his reputation and goodwill in the industry that he has expended considerable resources to develop.

92.     Due to the unlawful actions of CasperLabs, Mr. Zamfir has lost the ability to control his own reputation due to the false association of CasperLabs with his own Casper product and services.  This has financially damaged Mr. Zamfir by lessening the value of his reputation in the industry.

93.     Since the products of CasperLabs are of inferior quality to products advertised by Mr. Zamfir, the false association between Mr. Zamfir and CasperLabs damages Mr. Zamfir since it lessens the value of the Casper name in the industry, which is associated with Mr. Zamfir.

94.     Due to the unlawful actions of CasperLabs, Mr. Zamfir was forced to let go of contractors, and thereby delay the production of promised protocols under the Casper name, which has caused significant damage to Mr. Zamfir.

95.     Due to the unlawful actions of CasperLabs, existing clients forewent providing additional funding to Mr. Zamfir and CoorTech.

96.     Due to the unlawful actions of CasperLabs, existing clients forewent promoting Mr. Zamfir's Casper products and services under the name Casper, and minimized references to Mr. Zamfir's Casper products and services on their roadmaps and documentation under the name Casper.

97.     CasperLabs continued to falsely associate CasperLabs' Casper products and services with Mr. Zamfir and his Casper products and services after the relationship had ended, including, upon information and belief, to secure contracts and other investment, and these contracts and other investment could have gone to Mr. Zamfir but for the unlawful actions of CasperLabs.

29

98.    Plaintiff is entitled to, among other relief, injunctive relief and an award of actual damages, Defendant's profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117.

99.    Defendant's acts set forth have been deliberate, willful and wanton, making this an exceptional case within the meaning of 15 U.S.C. § 1117.

100.    Wherefore, Plaintiff prays for the relief requested below.

## COUNT 2

### (Unfair Competition/Trademark Infringement under 15 U.S.C. § 1125(a))

101.    Plaintiff repeats and re-alleges the allegations of Paragraphs 1-100 above, as if fully set forth herein.

102.    As stated above, Plaintiff has used the trademark Casper in commerce prior to any alleged use of Casper by Defendant.

103.    Defendant's use in commerce of the Casper name as alleged herein in connection with similar goods and services is likely to cause confusion, mistake and deception as to the origin, source, sponsorship, or affiliation of Defendant's PoS blockchain network, and is likely to cause consumers to believe, contrary to fact, that Defendant's proof-of-stake blockchain network is sold, authorized, endorsed, or sponsored by Plaintiff, or that Defendant is in some way affiliated with or sponsored by Plaintiff.

104.    Defendant's acts set forth above constitute unfair competition and trademark infringement in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

105.    Defendant's conduct as alleged herein is willful and is intended to cause confusion, mistake, or deception, as to the affiliation, connection, or association of Defendant with Plaintiff.

30

106.   Defendant's conduct as alleged herein is causing immediate and irreparable harm and injury to Plaintiff, and to Plaintiff's goodwill and reputation, and will continue to both damage Plaintiff and confuse the public unless enjoined by this court.  There is no adequate remedy at law for the harm caused by the wrongful acts alleged herein.

107.   Plaintiff is entitled to, among other relief, injunctive relief and an award of actual damages, Defendant's profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117.

108.   Defendant's acts set forth have been deliberate, willful and wanton, making this an exceptional case within the meaning of 15 U.S.C. § 1117.

109.   Wherefore, Plaintiff prays for the relief requested below.

## COUNT 3

### (Trademark Infringement under California Common Law)

110.   Plaintiff repeats and re-alleges the allegations of Paragraphs 1-109 above, as if fully set forth herein.

111.   Defendant's unlawful use of the CASPER trademark described above constitutes trademark infringement resulting in damage to Plaintiff in violation of the Common Law of the State of California.

112.   Plaintiff has been, is now and will be irreparably harmed by Defendant's aforementioned wrongful acts, unless enjoined by this Court.

113.   Wherefore, Plaintiff prays for the relief requested below.

## COUNT 4

### (Unfair Competition under California Common Law)

114.   Plaintiff repeats and re-alleges the allegations of Paragraphs 1-113 above, as if fully set forth herein.

31

115.   Defendant's unlawful use of the CASPER trademark described above constitutes unfair competition resulting in damage to Plaintiff in violation of the Common Law of the State of California.

116.   Plaintiff has been, is now and will be irreparably harmed by Defendant's aforementioned wrongful acts, unless enjoined by this Court.

117.   Wherefore, Plaintiff prays for the relief requested below.

## COUNT 5

### (Cancellation of U.S. Trademark Registration No. 6202402)

118.   Plaintiff repeats and re-alleges the allegations of Paragraphs 1-117 above, as if fully set forth herein.

119.   As stated above, Plaintiff has used the trademark Casper in commerce prior to any alleged use of Casper by Defendant.

120.   Defendant's use in commerce of the mark CASPER with the services in Registration No. 6202402is likely to cause confusion, mistake and deception as to the origin, source, sponsorship, or affiliation of Defendant's PoS blockchain network, and is likely to cause consumers to believe, contrary to fact, that Defendant's proof-of-stake blockchain network is sold, authorized, endorsed, or sponsored by Plaintiff, or that Defendant is in some way affiliated with or sponsored by Plaintiff.

121.   Registration No. 6202402 should be cancelled because it consists of a mark which so resembles Plaintiff's previously used mark as to be likely, when used on or in connection with the services of the Defendant, to cause confusion, or to cause mistake, or to deceive in violation of 15 U.S.C. 1052(d).

122.   Plaintiff, and the goodwill and reputation that Plaintiff has developed over several years of research and marketing, is and will be damaged by continued registration of the mark in Registration No. 6,202,402.

123.   Plaintiff has been, is now and will be irreparably harmed by Defendant's aforementioned improper trademark registration, unless that trademark registration is

32

cancelled by this Court, pursuant to 15 U.S.C. § 1052(d), § 1064(1), and § 1119 or in the alternative, under § 1119 direct Defendant to assign U.S. Trademark Registration No. 6202402 to Plaintiff.

124.    Wherefore, Plaintiff prays for the relief requested below.

## COUNT 6

### (Cancellation of U.S. Trademark Registration No. 6131157)

125.    Plaintiff repeats and re-alleges the allegations of Paragraphs 1-124 above, as if fully set forth herein.

126.    As stated above, Plaintiff has used the trademark Casper in commerce prior to any alleged use of Casper or CasperLabs by Defendant.

127.    Defendant's use in commerce of the mark CASPER with the goods and services in Registration No. 6131157 is likely to cause confusion, mistake and deception as to the origin, source, sponsorship, or affiliation of Defendant's PoS blockchain network, and is likely to cause consumers to believe, contrary to fact, that Defendant's proof-of-stake blockchain network is sold, authorized, endorsed, or sponsored by Plaintiff, or that Defendant is in some way affiliated with or sponsored by Plaintiff.

128.    Registration No. 6131157 should be cancelled because it consists of a mark which so resembles Plaintiff's previously used mark as to be likely, when used on or in connection with the services of the Defendant, to cause confusion, or to cause mistake, or to deceive in violation of 15 U.S.C. 1052(d)..

129.    Plaintiff, and the goodwill and reputation that Plaintiff has developed over several years of research and marketing, is and will be damaged by continued registration of the mark in Registration No. 6131157.

130.    Plaintiff has been, is now and will be irreparably harmed by Defendant's aforementioned improper trademark registration, unless that trademark registration is cancelled by this Court, pursuant to 15 U.S.C. § 1052(d), § 1064(1), and § 1119 or in

33

1   the alternative, under § 1119 direct Defendant to assign U.S. Trademark Registration

2   No. 6131157 to Plaintiff.

3       131.   Wherefore, Plaintiff prays for the relief requested below.

4                           **<u>COUNT 7</u>**

5       **(Fraud by Intentional Misrepresentation under Cal. Civ. C. §§ 1709, 1710)**

6       132.   Plaintiff repeats and re-alleges the allegations of Paragraphs 1-131

7   above, as if fully set forth herein.

8       133.   In July 2019, CasperLabs, through its then Managing Director Scott

9   Walker, acknowledged Plaintiff's objections to Defendant using the CASPER mark,

10  and represented to Plaintiff that CasperLabs would secure the CASPER mark for

11  Plaintiff.

12      134.   CasperLabs' representations that it would obtain the CASPER trademark

13  on Plaintiff's behalf, while instead pursuing registration of the mark in its own name,

14  were false and an intentional misrepresentation.

15      135.   Walker's representations in the July 10, 2019 communication were false

16  at the time the communication was made because he told Plaintiff's agent that it

17  would be a difficult to trademark CASPER, which was false or made with reckless

18  disregard of the truth since CasperLabs had actual knowledge that its CASPERLABS

19  trademark application for virtually identical services as those contemplated by the

20  CASPER trademark previously went through substantive examination at the USPTO

21  without any significant hurdles to registration. *See* ¶ 63.

22      136.   CasperLabs knew about the USPTO's technical Office Action on April

23  30, 2019 of the CASPERLABS trademark application prior to the representations in

24  the July 10, 2019 communication to Plaintiff regarding the difficulty of obtaining the

25  CASPER trademark.  The April 30, 2019 Office Action was non-substantive, and, in

26  fact, outlined acceptable suggested identifications of goods and services for the

27  application.

28

                                      34

137.   Based on the USPTO's treatment of the CASPERLABS trademark, there is no reason for Walker's statement about the difficulty of obtaining the CASPER trademark except to deceive and defraud Plaintiff and falsely obfuscate CasperLabs' ability to register the CASPER trademark. *See* ¶ 63.

138.   Walker's statement about the difficulty of registering the CASPER trademark was an intentional misrepresentation that blatantly disregarded the truth.

139.   CasperLabs intended that Plaintiff would rely on its representations that it would obtain the CASPER mark on behalf of Plaintiff and/or Plaintiff's company.

140.   Plaintiff reasonably relied upon Defendant's representation that it would register the CASPER mark on his behalf and, in light of those representations, did not separately seek registration of the CASPER mark.

141.   Plaintiff reasonably and justifiably relied on CasperLabs' misrepresentation that CasperLabs would obtain the CASPER mark for Plaintiff both in light of the nature of the parties' business relationship at the time and based upon CasperLabs' numerous assurances to Plaintiff that they would not use the CASPER mark to refer to their blockchain and/or blockchain token.

142.   In September 2019 CasperLabs instead filed a trademark application for the CASPER trademark Ser. Nos. 88/979132 and 88/603814 in its own name. CasperLabs never mentioned to Mr. Zamfir that they applied for registrations of the CASPER and CASPERLABS marks, nor did they discuss ongoing prosecution of those registrations before the U.S. Patent and Trademark Office with Mr. Zamfir, including any Office Actions.

143.   Contrary to its representations, Defendant registered and proceeded to use the CASPER mark in its own name, and never transferred the mark to Plaintiff, harming Plaintiff and depriving Plaintiff of his exclusive ownership rights to the CASPER mark.

144.   To date, CasperLabs has not assigned the CASPER trademark to Plaintiff despite its representations in July 2019 that CasperLabs was obtaining the trademark for Plaintiff's company.

## COUNT 8

### (Unlawful and Unfair Business Practices and False Advertising California Business & Professions Code § 17200)

145.   Plaintiff repeats and re-alleges the allegations of Paragraphs 1-144 above, as if fully set forth herein.

146.   CasperLabs' conduct, described above, constitutes unlawful, unfair or fraudulent business acts or practices and as such constitutes unfair competition under California Business & Professions Code §§ 17200 et seq.  As a consequence of Defendant's actions, Plaintiff is entitled to relief.

147.   CasperLabs' conduct constitutes unlawful and unfair business acts or practices in that CasperLabs has engaged in unfair competition through using a false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

148.   As a direct and proximate result of CasperLabs' wrongful and unfair conduct, Plaintiff has been, is now, and will be irreparably injured and damaged, and unless CasperLabs is enjoined by the Court, Plaintiff will suffer further harm to its CASPER name, and associated reputation, and goodwill.  This harm constitutes an injury for which Plaintiff has no adequate remedy at law.

149.   On information and belief, CasperLabs has acted willfully.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment as follows:

A.   That Defendant's use of CASPER has violated the Lanham Act, 15 U.S.C. § 1125(a) through its trademark infringement and false designation of origin.

B.   That Defendant's use of CASPER constitutes trademark infringement under the Common Law of the State of California.

36

1    C.      That Defendant has engaged in unfair competition under the Common

2  Law of the State of California and in violation of California Business & Professions

3  Code § 17200.

4    D.      That Defendant's trademark registrations for CASPER (U.S. Trademark

5  Registration No. 6202402) and CASPERLABS (U.S. Trademark Registration No.

6  6131157) are in violation of 15 U.S.C. § 1052(d) and such registrations should be

7  cancelled.

8    E.      That Defendant has committed intentional misrepresentation under

9  California Law.

10    F.      A Declaration that Defendant is not the owner of the CASPER

11 trademark and any rights in the CASPER mark by Defendants are *void ab initio*.

12    G.      Granting an injunction permanently enjoining the Defendant, its

13 employees, agents, officers, directors, attorneys, successors, parents, affiliates,

14 subsidiaries, assigns, associations or other legal forms such as "decentralized

15 autonomous organizations" (DAOs) and any legal persons who are substantially

16 complicit in the unlawful acts described herein, which may include wallets, users,

17 validators and validator pools, market makers and traders, crypto and other financial

18 services providers (whether operating on the primary or secondary markets),

19 community managers and volunteers, and block explorers and other data aggregators,

20 and all of those in active concert and participation with any of the foregoing persons

21 and entities who receive actual notice of the Court's order by personal service or

22 otherwise from:

23            a.  engaging in any activity constituting unfair competition with

24                Plaintiff;

25            b.  making or displaying any statement, representation, or depiction that

26                is likely to lead the public or the trade to believe that Defendant's

27                proof-of-stake blockchain network is in any manner approved,

28

endorsed, licensed, sponsored, authorized, or franchised by or associated, affiliated, or otherwise connected with Plaintiff;

c. using or authorizing any third party to use in connection with any business, goods, or services any false description, false representation, or false designation of origin, or any marks, names, words, symbols, devices, or trade dress that falsely associate such business, goods and/or services with Plaintiff or tend to do so;

d. registering or applying to register any trademark, service mark, domain name, trade name, or other source identifier or symbol of origin consisting of or incorporating the mark CASPER or any other mark that is likely to be confused with Plaintiff's CASPER mark, or any goods or services of Plaintiff, or Plaintiff as their source; and

e. aiding, assisting, or abetting any other individual or entity in doing any act prohibited by sub-paragraphs (a) through (d).

H. Granting such other and further relief as the Court may deem proper to prevent the public and trade from deriving the false impression that any goods or services manufactured, sold, distributed, licensed, marketed, advertised, promoted, or otherwise offered or circulated by Defendant are in any way approved, endorsed, licensed, sponsored, authorized, or franchised by or associated, affiliated, or otherwise connected with Plaintiff or constitute or are connected with Plaintiff's proof-of-stake blockchain protocol.

I. Directing Defendant to formally abandon with prejudice any and all of its U.S. applications to register the mark CASPER or any mark consisting of, incorporating, or containing Plaintiff's CASPER mark or any counterfeit, copy, confusingly similar variation, or colorable imitation thereof on any state or federal trademark registry.

38

J.      Directing Defendant to cancel with prejudice any and all of its U.S. registrations for the mark CASPER or any mark consisting of, incorporating, or containing Plaintiff's CASPER mark or any counterfeit, copy, confusingly similar variation, or colorable imitation thereof on any state or federal trademark registry.

K.      Directing, pursuant to Section 37 of the Lanham Act, 15 U.S.C. § 1119, the cancellation of U.S. Trademark Registration Nos. 6202402 and 6131157, and any and all other federal registrations for the mark CASPER or any mark consisting of, incorporating, or containing Plaintiff's CASPER mark or any counterfeit, copy, confusingly similar variation, or colorable imitation thereof owned or controlled by Defendant or in the alternative direct Defendant to assign U.S. Trademark Registration Nos. 6202402 and 6131157 to Plaintiff.

L.      Directing, pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1116(a), Defendant to file with the court and serve upon Plaintiff's counsel within thirty (30) days after service on Defendant of an injunction in this action, or such extended period as the court may direct, a report in writing under oath, setting forth in detail the manner and form in which Defendant has complied therewith.

M.      Awarding Plaintiff damages for the claims arising under 15 U.S.C. § 1125(a) as well as damages for the claim brought under California common law;

N.      Awarding Plaintiff his actual damages and Defendant's unjust and unlawful profits arising from Defendant's misconduct;

O.      Awarding Plaintiff an amount up to three times the amount of actual damages, in accordance with Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

P.       Directing that Defendant account to and pay over to Plaintiff all profits realized by its wrongful acts in accordance with Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), enhanced as appropriate to compensate Plaintiff for the damages caused thereby.

1  Q.  Awarding Plaintiff punitive and exemplary damages as the Court finds
2  appropriate to deter any future willful infringement.

3  R.  Declaring that this is an exceptional case pursuant to Section 35(a) of the
4  Lanham Act and awarding Plaintiff costs and reasonable attorneys' fees thereunder
5  (15 U.S.C. § 1117(a)).

6  S.  Awarding Plaintiff interest, including prejudgment and post-judgment
7  interest, on the foregoing sums.

8  T.  Awarding such other and further relief as the Court deems just and
9  proper.

## JURY DEMAND

11  Plaintiff demands a trial by jury.

13  Dated: March 8, 2022          By: */s/ Christopher Ott*
                                      Christopher Ott (CA Bar No. 235659)
14                                    16501 Los Barbos
15                                    Rancho Santa Fe, CA 592067
                                      ROTHWELL, FIGG, ERNST &
16                                    MANBECK, P.C.
17                                    607 14th Street, NW; Suite 800
18                                    Washington, DC  20005
                                      202-783-6040
19
20                                    Jennifer A. Golinveaux (SBN 203056)
                                      WINSTON & STRAWN LLP
21                                    101 California Street, 35th Floor
22                                    San Francisco, CA  94111-5840
                                      Telephone:     (415) 591-1000
23
24                                    *Attorneys for Plaintiff Vlad Zamfir*

40

## <u>TABLE OF CONTENTS OF EXHIBITS</u>

### Exhibits to Plaintiff's Second Amended Complaint

| EX. | DESCRIPTION | STARTING PAGE NO. |
|---|---|---|
| A | August 1, 2015 blog post by Vlad Zamfir titled "Introducing Casper 'the Friendly Ghost'" on Ethereum.org, found at https://blog.ethereum.org/2015/08/01/introducing-casper-friendly-ghost/ | 1 |
| B | Screenshot of GitHub homepage, found at https://github.com/ | 9 |
| C | March 2017 formal verification of CBC Casper on GitHub, found at https://github.com/pirapira/cbc_casper | 29 |
| D | March 2017 formal verification of CBC Casper on GitHub, found at https://github.com/vladzamfir/cbc_casper | 31 |
| E | Schedule of releases of CBC Casper on GitHub, found at https://github.com/ethereum/cbc-casper/releases | 33 |
| F | GNU Affero General Public License (Version 3), dated November 19, 2007 | 36 |
| G | README file accompanying the v0.1 Devcon3 Release of the CBC Casper code on GitHub, found at https://github.com/ethereum/cbc-casper/releases/tag/v0.1.0 | 51 |

| EX. | DESCRIPTION | STARTING PAGE NO. |
|---|---|---|
| H | December 18, 2017 draft CBC Casper protocol specification by Vlad Zamfir titled "Casper the Friendly Ghost: A 'Correct-by-Construction' Blockchain Consensus Protocol," found at https://github.com/ethereum/research/blob/master/papers/CasperTFG/CasperTFG.pdf | 56 |
| I | RChain Cooperative Documentation, found at https://developer.rchain.coop/documentation | 73 |
| J | RChain Cooperative Wiki page, found at https://rchain.atlassian.net/wiki/spaces/CORE/pages/92536846/Political%2BCapital%2BCasper | 77 |
| K | September 22, 2017 press release titled "Vlad Zamfir Joins the RChain Cooperative," found at https://medium.com/rchain-cooperative/vlad-zamfir-joins-the-rchain-cooperative-a05f8e32c110 | 89 |
| L | September 22, 2017 tweet by Vlad Zamfir on Twitter, found at https://twitter.com/VladZamfir/status/911191217295253504 | 93 |
| M | RChain Cooperative Resources, found at https://rchain.coop/resources.html | 96 |
| N | September 30, 2016 Invoice from Coordination Technology LTD to Synereo LTD for speaking services and participation | 105 |

TABLE OF CONTENTS OF EXHIBITS

| EX. | DESCRIPTION | STARTING PAGE NO. |
|-----|-------------|-------------------|
| O | April 30, 2019 Office Action filed in U.S. Trademark Application Serial No. 88300598 | 107 |

# EXHIBIT A

# Introducing Casper "the Friendly Ghost"

*Posted by Vlad Zamfir on August 1, 2015*

Research & Development (/category/research-and-development/)

Hi everyone – Vlad here. I've been working on the analysis and specification of  "proof-of-stake" blockchain architecture since September 2014. While Vitalik and I haven't agreed on all of the details of the spec, we do have consensus on many properties of the proof-of-stake protocol that will likely be implemented for the Serenity release! It is called Casper "the friendly ghost" because it is an adaptation of some of the principles of the GHOST (Greedy Heaviest-Observed Sub-Tree) protocol for proof-of-work consensus to proof-of-stake. This blog post (my first one!) shares properties that are likely to be true of Casper's implementation in the Serenity release. Formal verification and simulation of Casper's properties is under way, and will be published eventually - in the meantime, please enjoy this high-level, informal discussion!  : )

# Security-deposit based security and authentication

Casper is a security-deposit based economic consensus protocol. This means that nodes, so called "bonded validators", have to place a security deposit (an action we call "bonding") in order to serve the consensus by producing blocks. The protocol's direct control of these security deposits is the primary way in which Casper affects the incentives of validators. Specifically, if a validator produces anything that Casper considers "invalid", their deposit are forfeited along with the privilege of participating in the consensus process. The use of security deposits addresses the "nothing at stake" problem; that behaving badly is not expensive. There is something at stake, and bonded validators who misbehave in an objectively verifiable manner *will* lose it.

Very notably, a validator's signature is only economically meaningful so long as that validator *currently* has a deposit. This means that clients can only rely on signatures from validators that they know are *currently* bonded. Therefore, when clients receive and authenticate the state of the consensus, *their authentication chain ends in the list of currently-bonded validators*. In proof-of-work consensus, on the other hand, the authentication chain ends in the genesis block - as long as you know the genesis block you can authenticate the consensus. Here, as long as you know the set of currently-bonded validators, you can authenticate the consensus. A client who does not know the

Exhibit A
Page 2

list of currently bonded validators must authenticate this list out-of-band. This restriction on the way in which the consensus is authenticated solves the "long range attack" problem by requiring that everyone authenticate the consensus against current information.

The validator list changes over time as validators place deposits, lose their deposits, unbond, and get unbonded. Therefore, if clients are offline for too long, their validator list will no longer be current enough to authenticate the consensus. In the case that they are online sufficiently often to observe the validator set rotating, however, clients are able to securely update their validator list. Even in this case, clients must begin with an up-to-date list of currently-bonded validators, and therefore they must authenticate this list out-of-band *at least* once.

This "out-of-band authentication only necessarily once" property is what Vitalik calls *weak subjectivity*. In this context information is said to be "objective" if it can be verified in a protocol-defined manner, while it is "subjective" if it must be authenticated via extra-protocol means. In weakly subjective consensus protocols, *the fork-choice rule is stateful*, and clients must initialize (and possibly sometimes renew) the information that their fork-choice rule uses to authenticate the consensus. In our case, this entails identifying the currently bonded validators (or, more probably a cryptographic hash of the validator list).

# Gambling on Consensus

Casper makes validators bet a large part of their security deposits on how the consensus process will turn out. Moreover, the consensus process "turns out" in the manner in which they bet: validators are made to bet their deposits on how they expect everyone else to be betting their deposits. If they bet correctly, they earn their deposit back with transaction fees and possibly token issuance upon it – if on the other hand they do not quickly agree, they re-earn less of their deposit. Therefore through iterated rounds of betting validator bets converge.

Moreover, if validators change their bets too dramatically, for example by voting with a high probability on one block after voting with a very high probability on another, then they are severely punished. This guarantees that validators bet with very high probabilities only when they are confident that the other validators will also produce high probability bets. Through this mechanism we guarantee that their bets never converge to a second value after converging upon a first, as long as there there is sufficient validator participation.

Proof-of-work consensus is also a betting scheme: miners bet that their block will be part of the heaviest chain; if they eventually prove to be correct, they receive tokens - whereas if they prove to be incorrect, they incur electricity costs without compensation. Consensus is secured as long as all

miners are betting their hashing power on the same chain, making it the blockchain with the most work (*as a direct result of and as preempted by their coordinated betting*). The economic cost of these proof-of-work bets add up linearly in the number of confirmations (generations of descendant blocks), while, in Casper, validators can coordinate placing exponentially growing portions of their security deposits against blocks, thereby achieving maximum security very quickly.

# By-height Consensus

Validators bet independently on blocks at every height (i.e. block number) by assigning it a probability and publishing it as a bet. Through iterative betting, the validators elect exactly one block at every height, and this process determines the order in which transactions are executed. Notably, if a validator ever places bets with probabilities summing to more than 100% at a time for a given height, or if any are less than 0%, or if they bet with more than 0% on an invalid block, then Casper forfeits their security deposit.

# Transaction Finality

When every member of a supermajority of bonded validators (a set of validators who meet a protocol-defined threshold somewhere between 67% and 90% of bonds) bets on a block with a very high (say, > 99.9%) probability, the fork-choice rule never accepts a fork where this block does not win, and we say that the block is *final*. Additionally, when a client sees that every block lower than some height **H** is final, then the client will never choose a fork that has a different application state at height **H - 1** than the one that results from the execution of transactions in these finalized blocks. In this eventuality, we say that this state is finalized.

There are therefore two relevant kinds of transaction finality: the finality of the fact that the transaction will be executed at a particular height (which is from finality of its block, and therefore priority over all future blocks *at that height*), and the finality of the consensus state after that transaction's execution (which requires finality of its block and of unique blocks at all lower heights).

# Censorship Resistance

One of the largest risks to consensus protocols is the formation of coalitions that aim to maximize the profits of their members at the expense of non-members. If Casper's validators' revenues are to be made up primarily of transaction fees, for example, a majority coalition could censor the

Exhibit A
Page 4

remaining nodes in order to earn an increased share of transaction fees. Additionally, an attacker could bribe nodes to exclude transactions affecting particular addresses – and so long as a majority of nodes are rational, they can censor the blocks created by nodes who include these transactions.

To resist attacks conducted by majority coalitions, Casper regards the consensus process as a cooperative game (https://en.wikipedia.org/wiki/Cooperative_game) and ensures that each node is most profitable if they are in a coalition made up of 100% of the consensus nodes (at least as long as they are incentivized primarily by in-protocol rewards). If $p$% of the validators are participating in the consensus game, then they earn $f(p) ≤ p$% of the revenues they would earn if 100% of the validators were participating, for some increasing function $f$.

More specifically, Casper punishes validators for not creating blocks in a protocol-prescribed order. The protocol is aware of deviations from this order, and withholds transaction fees and deposits from validators accordingly. Additionally, the revenue made from betting correctly on blocks is linear (or superlinear) in the number of validators who are participating in at that height of the consensus game.

# Will there be more transactions per second?

Most probably, yes, although this is due to the economics of Casper rather than due to its blockchain architecture. However, Casper's blockchain does allow for faster block times than is possible with proof-of-work consensus.

Validators will likely be earning only transaction fees, so they have a direct incentive to increase the gas limit, if their validation server can handle the load. However, validators also have reduced returns from causing other, slower validators to fall out of sync, so they will allow the gas limit to rise only in a manner that is tolerable by the other validators. Miners investing in hardware primarily purchase more mining rigs, while validators investing in hardware primarily upgrade their servers so they can process more transactions per second. Miners also have an incentive to reinvest in more powerful transaction processing, but this incentive is much weaker than their incentive to purchase mining power.

Security-deposit-based proof-of-stake is very light-client friendly relative to proof-of-work. Specifically, light clients do not need to download block headers to have full security in authenticating the consensus, or to have full economic assurances of valid transaction execution. This means that a lot of consensus overhead affects only the validators, but not the light clients, and it allows for lower latency without causing light clients to lose the ability to authenticate the consensus.

Exhibit A
Page 5

# Recovery from netsplits

Casper is able to recover from network partitions because transactions in non-finalized blocks can be reverted. After a partition reconnects, Casper executes transactions from blocks that received bets on the partition with higher validator participation. In this manner, nodes from either side of the partition agree on the state of the consensus after a reconnection and before validators are able to replace their bets. Validator bets converge to finalize the blocks in the partition that had more validator participation, with very high probability. Casper will very likely process the losing transactions from losing blocks after the ones from winning blocks, although it is still to be decided whether validators will have to include these transactions in new blocks, or if Casper will execute them in their original order, himself.

# Recovery from mass crash-failure

Casper is able to recover from the crash-failure of all but one node. Bonded validators can always produce and place bets on blocks on their own, although they always make higher returns by coordinating on the production of blocks with a larger set of validators. In any case, a validator makes higher returns from producing blocks than from not producing blocks at all. Additionally, bonded validators who appear to be offline for too long will be unbonded, and new bonders subsequently will be allowed to join the validation set. Casper can thereby potentially recover precisely the security guarantees it had before the mass crash-failure.

# What is Casper, in non-economic terms?

Casper is an eventually-consistent blockchain-based consensus protocol. It favours availability over consistency (see the CAP theorem (https://en.wikipedia.org/wiki/CAP_theorem)). It is always available, and consistent whenever possible. It is robust to unpredictable message delivery times because nodes come to consensus via re-organization of transactions, after delayed messages are eventually received. It has an eventual fault tolerance of 50%, in the sense that a fork created by >50% correct nodes scores higher than any fork created by the remaining potentially-faulty validators. Notably, though, clients cannot be certain that any given fork created with 51% participation won't be reverted because they cannot know whether some of these nodes are Byzantine. Clients therefore only consider a block as finalized if it has the participation of a supermajority of validators (or bonded stake).

# What is it like to be a bonded validator?

Exhibit A
Page 6

As a bonded validator, you will need to securely sign blocks and place bets on the consensus process. If you have a very large deposit, you will probably have a handful of servers in a custom multisig arrangement for validation, to minimize the chance of your server misbehaving or being hacked. This will require experimentation and technical expertise.

The validator should be kept online as reliably and as much as possible, for it to maximize its profitability (or for otherwise it will be unprofitable). It will be very advisable to buy DDoS protection. Additionally, your profitability will depend on the performance and availability of the other bonded validators. This means that there is risk that you cannot directly mitigate, yourself. You could lose money even if other nodes don't perform well - but you will lose more money yet if you don't participate at all, after bonding. However, additional risk also often means higher average profitability - especially if the risk is perceived but the costly event never occurs.

# What is it like to be an application or a user?

Applications and their users benefit a lot from the change from proof-of-work consensus to Casper. Lower latency significantly improves the user's experience. In normal conditions transactions finalize very quickly. In the event of network partitions, on the other hand, transactions are still executed, but the fact that they can potentially still be reverted is reported clearly to the application and end-user. The application developer therefore still needs to deal with the possibility of forking, as they do in proof-of-work, but the consensus protocol itself provides them with a clear measure of what it would take for any given transaction to be reverted.

# When can we hear more?

Stay tuned! We'll be sure to let you know more of Casper's specification over the next months, as we come to consensus on the protocol's details. In addition, you can look forward to seeing simulations, informal and formal specification, formal verification, and implementations of Casper! But please, be patient: R&D can take an unpredictable amount of time!  : )

← PREVIOUS POST (/2015/07/30/ANNOUNCING-NEW-FOUNDATION-BOARD-EXECUTIVE-DIRECTOR/)

NEXT POST → (/2015/08/04/THE-THAWING-FRONTIER/)

**Exhibit A**
**Page 7**

 (/feed.xml)   (mailto:info@ethereum.org)   (https://www.facebook.com/ethereumproject)

(https://github.com/ethereum)   (https://twitter.com/ethereum)

Ethereum Foundation (https://ethereum.foundation/) • 2021 • blog.ethereum.org
(https://blog.ethereum.org) • Blog Archive (/archive) • Do-not-Track
(http://matomo.ethereum.org/piwik//index.php?module=CoreAdminHome&action=optOut)

Theme by beautiful-jekyll (http://deanattali.com/beautiful-jekyll/)

**Exhibit A**
**Page 8**

# EXHIBIT B



**Exhibit B**
**Page 10**

6/1/2021                    GitHub: Where the world builds software · GitHub





https://github.com                                                                      2/19

**Exhibit B**
**Page 11**



Support Octocats shared on Twitter

Created index.js

## Build on what's been built

**Write less code thanks to the world's largest software package registry.** Find the best community-approved projects to accelerate your work, then share it with the world with npm and GitHub Packages.

```
→ ~/octocat-classifier npm install eslint
+ eslint@7.8.1
  added 109 packages from 64 contributors and audited 109 packages in 3.491s

9 packages are looking for funding

  run `npm fund` for details

found 0 vulnerabilities
→ ~/octocat-classifier
```



```
>_    git checkout -b origin add-status-screens
```



**+3 collaborators**

# Ready player two. Scale your team to any size in the cloud.

**Create a new organization for free** →

**Better code starts with pull requests**— conversations around your code where you can experiment, squash bugs, and build new features.

**Code review is built in.** Pull requests cover the entire review flow: propose changes, browse code, ask for input, make a suggestion, and sign off in one place.

**Exhibit B**
**Page 13**

## Know when your pull request is ready to merge when everything's green. Reviews approved? Check. Tests passing? Check check. No conflicts? Ship it already.

```
git merge add-status-screens
```



## Keep work moving. Review or merge code, manage notifications, browse repositories, and

**Exhibit B**
**Page 14**

6/1/2021                          GitHub: Where the world builds software · GitHub

more with **GitHub for mobile.**

**Available for iOS and Android**

```
➜ ~ gh pr status
Relevant pull requests in cli/cli

Current branch
There is no pull request associated with [main]

Created by you
You have no open pull requests

Requesting a code review from you
#1401 Correctly handle and set empty fields...
[octocat:emptyBody]
✓ Checks passing
#1357 Added confirmation steps for risk...
[octocat:confirmations]
x 1/3 checks failing
➜ ~
```

**Work however you want.** Put a GUI on it with **GitHub Desktop** or stay in the command line with **GitHub CLI.**

**Available for macOS, Windows, and Linux***

* GitHub CLI is available on macOS, Windows, and Linux
* GitHub Desktop is available on macOS and Windows

**Exhibit B**
**Page 15**

# Instant dev environments with Codespaces

**Learn more about GitHub Codespaces** →

The future of code is in the cloud, not your local copy. Codespaces gives you a complete, configurable dev environment on top of a powerful VM in minutes.

**Exhibit B**
**Page 16**

**Visual Studio Code, in your browser, full stop.** Codespaces brings the world's most popular desktop editor to every repo. Code, build, test, use the terminal, and open pull requests from anywhere.

**Exhibit B**
**Page 17**

**Customize to your heart's desire.** Add your favorite VS Code extensions, create a devcontainer config file, install new themes, and tweak your settings.

**Exhibit B**
**Page 18**

6/1/2021                          GitHub: Where the world builds software · GitHub

# Automate anything with GitHub Actions

**Learn more about GitHub Actions** →

Setup CI/CD, enhance your DevOps, and script your entire workflow with GitHub Actions. Kick off automated workflows with GitHub events like push, issue creation, merge, and release.

```
 1   on: p|
 2   jobs
 3     te    push
 4           public
 5           package
 6           project          , macos-latest, windows-latest]
 7           page_build           }}
 8           pull_request
 9           project_card              ter
10           profect_column            aster
11           pull_request_target
12           pull_request_review
13           pull_request_review
14       - uses: actions/checkout@master
15       - uses: actions/setup-node@master
16     build:
17       strategy:
18         matrix:
19           platform: [ubuntu-latest, macos-latest, windows-latest]
20       runs-on: ${{ matrix.platform }}
21     publish:
22       needs: [build]
```

## 5,000+
## Actions

**Exhibit B**
**Page 19**

GitHub: Where the world builds software · GitHub

Write your own, or import Actions from the open source community, all within our world-class editor. Feeling stuck? Browse the Actions developer docs as you code.

**Explore the Actions Marketplace** →

**Exhibit B**
**Page 20**

6/1/2021                                    GitHub: Where the world builds software · GitHub

**You can have it all.** Run actions in any language or operating system, on Linux, macOS, Windows, ARM, and containers. Or all at once with matrix builds.



With 70 million jobs run per month you're in good company with Actions, the number one CI service on the world's largest developer platform.



https://github.com                                                                    12/19

**Exhibit B**
**Page 21**

**Speaking of automation,** Dependabot keeps your projects up to date with automated pull requests that update all your dependencies. Just review and merge to keep your software secure.

**Learn more about Dependabot** →

# Find and fix vulnerabilities before you merge

**Learn more about advanced security** →

**Secure your code as you write it.** CodeQL's code scanning automatically reviews every change to your codebase and identifies known vulnerabilities before they ever reach production.

**Exhibit B**
**Page 22**

https://github.com

# The home for all developers — including you

**BETA**

**GitHub Discussions** is dedicated space for your community to come together, ask and answer questions, and have open-ended conversations.



**Found a vulnerability?** Our security advisory remediation tools help developers identify and

OAuth token found

Replaced OAuth token with a key vault value

**Keep your secrets.** We automatically scan repositories for OAuth tokens, API keys, personal tokens, and more. If we find one, we'll notify you and the partner that issued it to invalidate the secret.

Vulnerabilities found

Fixed deserialized data security vulnerability

GitHub: Where the world builds software · GitHub

Exhibit B
Page 23

**Learn how to get started with Discussions** →



Amplify your voice in your own personal README on your profile. Tell the story of your work through your repositories, contributions, and technologies of choice.



**Exhibit B**
**Page 24**



**sophshep** started sponsoring you for **$10/month**  (2x)  3 days ago

**joshaber** started sponsoring you for **$10/month**  (5x)  2 days ago

**pmarsceill** started sponsoring you for **$25/month**  2 days ago

**That open source code you wrote for yourself might just help someone else.** Get paid for building what matters to you with GitHub Sponsors.

Support the projects you depend on, too.

**100% to developers, zero fees**

**Exhibit B**
**Page 25**

**Learn more about Sponsors** →





**Exhibit B**
**Page 26**

6/1/2021                                    GitHub: Where the world builds software · GitHub

# Make your contribution

Small experiments, inspired inventions, and the software everyone depends on—the code you write on GitHub can reach one codebase or millions.

**Sign up for GitHub**

**Contact Sales**

tensorflow/**tensorflow**

An Open Source Machine Learning Framework for Everyone

gatsbyjs/**gatsby**

Build blazing fast, modern apps and websites with React

home-assistant/**core**

⌂ Open source home automatic puts local control and privacy fir

**lang/rust**

everyone to build reliable software.

flutter/**flutter**

Flutter makes it easy and fast to build beautiful apps for mobile and beyond.

kubernetes/**kubernetes**

Production-Grade Container Scheduling and Management

apple/**swift**

The Swift Programming Language

ansible/**ansible**

Ansible is a radically simple IT automation platform.

hashicorp/**terraform**

Terraform enables you to safely predictably create, change, and

**Exhibit B**
**Page 27**

zsh/**ohmyzsh**

facebook/**react**

npm/**cli**

ul community-driven
r managing your zsh…

A declarative, efficient, and flexible
JavaScript library for building user…

The package manager for JavaScript

**Exhibit B**
**Page 28**

# EXHIBIT C

**Exhibit C**
**Page 29**



# pirapira / cbc_casper

Isabelle formalization of binary consensus

7 stars 4 forks

Star Notifications

Code Issues Pull requests Actions Projects Wiki Security

master

Go to file

**pirapira** Merge pull request #4 from pirapira/fix_proofs ... on Mar 8, 2017 16

View code

## Releases

No releases published

## Packages

No packages published

## Contributors 2

**pirapira** Yoichi Hirai

**vladzamfir** Vlad Zamfir

## Languages

**Isabelle** 100.0%

**Exhibit C**
**Page 30**

# EXHIBIT D



vladzamfir / **cbc_casper**

forked from pirapira/cbc_casper

Isabelle formalization of binary consensus

2 stars 4 forks

Star Notifications

Code Pull requests 1 Actions Projects Wiki Security Insights

master

Go to file

This branch is 15 commits behind pirapira:master.

Pull request Compare

**pirapira** Initial commit ...

on Mar 2, 2017 1

View code

## Releases

No releases published

## Packages

No packages published

## Languages

**Isabelle** 100.0%

**Exhibit D**
**Page 32**

# EXHIBIT E

 ethereum / **cbc-casper**

<> Code   ⊙ Issues `19`   ⑂ Pull requests `3`   ▶ Actions   ▦ Projects   📖 Wiki   ⊙ Secu

---

**Releases**   Tags

---

# v0.3 Codebase Redesign + (Basic) Binary Blockchain Sharding

🏷 0.3.0   ⊸ 574a03e                                    Compare ▾   ✓ Verified

🟩 **naterush** released this on Apr 27, 2018

Some major (breaking) changes here, that will hopefully make the codebase easier to maintain and extend going forward!

- Redesign based on the specification here. Essentially, the execution of the protocol is specified in a JSON object. This is a fairly major change to most of the codebase, and most of the changes are specified in the specification linked above.
- Adds a very basic version of binary blockchain sharding w/ synchronous cross-shard calls between select shards. Currently, this is a very limited version, in that it's just a sharded blockchain that's being replicated - all nodes are still on all shards. See description in the final slides of the talk here.
- New commands/removed commands to run all protocols. See readme for a full description of new commands.

---

▸ Assets 2

---

# v0.3.1 Fix README                                    Latest release

🏷 v0.3.1   ⊸ f92629f                                   Compare ▾

🟩 **naterush** released this on Apr 27, 2018

Update the readme with all the changes introduced in the last release, including breaking changes to commands.

---

▾ Assets 2

📄 Source code (zip)

**Exhibit E**
**Page 34**

📄 **Source code** (tar.gz)

# v0.2 Networks and More Consensus

🏷 0.2.0  ⦿ 4053cb3                                    [ Compare ▾ ]  [ Verified ]

⌐ **djrtwo** released this on Jan 24, 2018

- Rework of networks to make them more realistic with flexible delays.
- Hash-linking messages based on message headers, so messages now aren't added to a view until they are justified.
- Added consensus on an integer, a list, and a concurrent schedule.
- Rework state languages and testing languages to be able to describe more protocol states and test more protocols.
- Increase test coverage.

---

▸ **Assets** 2

---

# v0.1 Devcon3 Release

🏷 v0.1.0  ⦿ cc7321e                                    [ Compare ▾ ]

⌐ **djrtwo** released this on Nov 21, 2017

First release of repo.

Includes:

- the code that made those sweet gifs in the Devcon3 presentation
- blockchain and binary protocols using the same CBC base structure
- everything else

---

▸ **Assets** 2

**Exhibit E**
**Page 35**

# EXHIBIT F

GNU AFFERO GENERAL PUBLIC LICENSE
Version 3, 19 November 2007

Copyright (C) 2007 Free Software Foundation, Inc. <http://fsf.org/>
Everyone is permitted to copy and distribute verbatim copies
of this license document, but changing it is not allowed.

Preamble

  The GNU Affero General Public License is a free, copyleft license for
software and other kinds of works, specifically designed to ensure
cooperation with the community in the case of network server software.

  The licenses for most software and other practical works are designed
to take away your freedom to share and change the works.  By contrast,
our General Public Licenses are intended to guarantee your freedom to
share and change all versions of a program--to make sure it remains free
software for all its users.

  When we speak of free software, we are referring to freedom, not
price.  Our General Public Licenses are designed to make sure that you
have the freedom to distribute copies of free software (and charge for
them if you wish), that you receive source code or can get it if you
want it, that you can change the software or use pieces of it in new
free programs, and that you know you can do these things.

  Developers that use our General Public Licenses protect your rights
with two steps: (1) assert copyright on the software, and (2) offer
you this License which gives you legal permission to copy, distribute
and/or modify the software.

  A secondary benefit of defending all users' freedom is that
improvements made in alternate versions of the program, if they
receive widespread use, become available for other developers to
incorporate.  Many developers of free software are heartened and
encouraged by the resulting cooperation.  However, in the case of
software used on network servers, this result may fail to come about.
The GNU General Public License permits making a modified version and
letting the public access it on a server without ever releasing its
source code to the public.

  The GNU Affero General Public License is designed specifically to
ensure that, in such cases, the modified source code becomes available
to the community.  It requires the operator of a network server to
provide the source code of the modified version running there to the
users of that server.  Therefore, public use of a modified version, on
a publicly accessible server, gives the public access to the source
code of the modified version.

  An older license, called the Affero General Public License and

published by Affero, was designed to accomplish similar goals.  This is
a different license, not a version of the Affero GPL, but Affero has
released a new version of the Affero GPL which permits relicensing under
this license.

   The precise terms and conditions for copying, distribution and
modification follow.

                          TERMS AND CONDITIONS

   0. Definitions.

   "This License" refers to version 3 of the GNU Affero General Public License.

   "Copyright" also means copyright-like laws that apply to other kinds of
works, such as semiconductor masks.

   "The Program" refers to any copyrightable work licensed under this
License.  Each licensee is addressed as "you".  "Licensees" and
"recipients" may be individuals or organizations.

   To "modify" a work means to copy from or adapt all or part of the work
in a fashion requiring copyright permission, other than the making of an
exact copy.  The resulting work is called a "modified version" of the
earlier work or a work "based on" the earlier work.

   A "covered work" means either the unmodified Program or a work based
on the Program.

   To "propagate" a work means to do anything with it that, without
permission, would make you directly or secondarily liable for
infringement under applicable copyright law, except executing it on a
computer or modifying a private copy.  Propagation includes copying,
distribution (with or without modification), making available to the
public, and in some countries other activities as well.

   To "convey" a work means any kind of propagation that enables other
parties to make or receive copies.  Mere interaction with a user through
a computer network, with no transfer of a copy, is not conveying.

   An interactive user interface displays "Appropriate Legal Notices"
to the extent that it includes a convenient and prominently visible
feature that (1) displays an appropriate copyright notice, and (2)
tells the user that there is no warranty for the work (except to the
extent that warranties are provided), that licensees may convey the
work under this License, and how to view a copy of this License.  If
the interface presents a list of user commands or options, such as a
menu, a prominent item in the list meets this criterion.

   1. Source Code.

**Exhibit F**
**Page 38**

The "source code" for a work means the preferred form of the work for making modifications to it.  "Object code" means any non-source form of a work.

A "Standard Interface" means an interface that either is an official standard defined by a recognized standards body, or, in the case of interfaces specified for a particular programming language, one that is widely used among developers working in that language.

The "System Libraries" of an executable work include anything, other than the work as a whole, that (a) is included in the normal form of packaging a Major Component, but which is not part of that Major Component, and (b) serves only to enable use of the work with that Major Component, or to implement a Standard Interface for which an implementation is available to the public in source code form.  A "Major Component", in this context, means a major essential component (kernel, window system, and so on) of the specific operating system (if any) on which the executable work runs, or a compiler used to produce the work, or an object code interpreter used to run it.

The "Corresponding Source" for a work in object code form means all the source code needed to generate, install, and (for an executable work) run the object code and to modify the work, including scripts to control those activities.  However, it does not include the work's System Libraries, or general-purpose tools or generally available free programs which are used unmodified in performing those activities but which are not part of the work.  For example, Corresponding Source includes interface definition files associated with source files for the work, and the source code for shared libraries and dynamically linked subprograms that the work is specifically designed to require, such as by intimate data communication or control flow between those subprograms and other parts of the work.

The Corresponding Source need not include anything that users can regenerate automatically from other parts of the Corresponding Source.

The Corresponding Source for a work in source code form is that same work.

2. Basic Permissions.

All rights granted under this License are granted for the term of copyright on the Program, and are irrevocable provided the stated conditions are met.  This License explicitly affirms your unlimited permission to run the unmodified Program.  The output from running a covered work is covered by this License only if the output, given its content, constitutes a covered work.  This License acknowledges your rights of fair use or other equivalent, as provided by copyright law.

You may make, run and propagate covered works that you do not
convey, without conditions so long as your license otherwise remains
in force.  You may convey covered works to others for the sole purpose
of having them make modifications exclusively for you, or provide you
with facilities for running those works, provided that you comply with
the terms of this License in conveying all material for which you do
not control copyright.  Those thus making or running the covered works
for you must do so exclusively on your behalf, under your direction
and control, on terms that prohibit them from making any copies of
your copyrighted material outside their relationship with you.

  Conveying under any other circumstances is permitted solely under
the conditions stated below.  Sublicensing is not allowed; section 10
makes it unnecessary.

  3. Protecting Users' Legal Rights From Anti-Circumvention Law.

  No covered work shall be deemed part of an effective technological
measure under any applicable law fulfilling obligations under article
11 of the WIPO copyright treaty adopted on 20 December 1996, or
similar laws prohibiting or restricting circumvention of such
measures.

  When you convey a covered work, you waive any legal power to forbid
circumvention of technological measures to the extent such circumvention
is effected by exercising rights under this License with respect to
the covered work, and you disclaim any intention to limit operation or
modification of the work as a means of enforcing, against the work's
users, your or third parties' legal rights to forbid circumvention of
technological measures.

  4. Conveying Verbatim Copies.

  You may convey verbatim copies of the Program's source code as you
receive it, in any medium, provided that you conspicuously and
appropriately publish on each copy an appropriate copyright notice;
keep intact all notices stating that this License and any
non-permissive terms added in accord with section 7 apply to the code;
keep intact all notices of the absence of any warranty; and give all
recipients a copy of this License along with the Program.

  You may charge any price or no price for each copy that you convey,
and you may offer support or warranty protection for a fee.

  5. Conveying Modified Source Versions.

  You may convey a work based on the Program, or the modifications to
produce it from the Program, in the form of source code under the
terms of section 4, provided that you also meet all of these conditions:

a) The work must carry prominent notices stating that you modified it, and giving a relevant date.

b) The work must carry prominent notices stating that it is released under this License and any conditions added under section 7.  This requirement modifies the requirement in section 4 to "keep intact all notices".

c) You must license the entire work, as a whole, under this License to anyone who comes into possession of a copy.  This License will therefore apply, along with any applicable section 7 additional terms, to the whole of the work, and all its parts, regardless of how they are packaged.  This License gives no permission to license the work in any other way, but it does not invalidate such permission if you have separately received it.

d) If the work has interactive user interfaces, each must display Appropriate Legal Notices; however, if the Program has interactive interfaces that do not display Appropriate Legal Notices, your work need not make them do so.

  A compilation of a covered work with other separate and independent works, which are not by their nature extensions of the covered work, and which are not combined with it such as to form a larger program, in or on a volume of a storage or distribution medium, is called an "aggregate" if the compilation and its resulting copyright are not used to limit the access or legal rights of the compilation's users beyond what the individual works permit.  Inclusion of a covered work in an aggregate does not cause this License to apply to the other parts of the aggregate.

  6. Conveying Non-Source Forms.

  You may convey a covered work in object code form under the terms of sections 4 and 5, provided that you also convey the machine-readable Corresponding Source under the terms of this License, in one of these ways:

a) Convey the object code in, or embodied in, a physical product (including a physical distribution medium), accompanied by the Corresponding Source fixed on a durable physical medium customarily used for software interchange.

b) Convey the object code in, or embodied in, a physical product (including a physical distribution medium), accompanied by a written offer, valid for at least three years and valid for as long as you offer spare parts or customer support for that product model, to give anyone who possesses the object code either (1) a copy of the Corresponding Source for all the software in the

product that is covered by this License, on a durable physical
medium customarily used for software interchange, for a price no
more than your reasonable cost of physically performing this
conveying of source, or (2) access to copy the
Corresponding Source from a network server at no charge.

c) Convey individual copies of the object code with a copy of the
written offer to provide the Corresponding Source.  This
alternative is allowed only occasionally and noncommercially, and
only if you received the object code with such an offer, in accord
with subsection 6b.

d) Convey the object code by offering access from a designated
place (gratis or for a charge), and offer equivalent access to the
Corresponding Source in the same way through the same place at no
further charge.  You need not require recipients to copy the
Corresponding Source along with the object code.  If the place to
copy the object code is a network server, the Corresponding Source
may be on a different server (operated by you or a third party)
that supports equivalent copying facilities, provided you maintain
clear directions next to the object code saying where to find the
Corresponding Source.  Regardless of what server hosts the
Corresponding Source, you remain obligated to ensure that it is
available for as long as needed to satisfy these requirements.

e) Convey the object code using peer-to-peer transmission, provided
you inform other peers where the object code and Corresponding
Source of the work are being offered to the general public at no
charge under subsection 6d.

  A separable portion of the object code, whose source code is excluded
from the Corresponding Source as a System Library, need not be
included in conveying the object code work.

  A "User Product" is either (1) a "consumer product", which means any
tangible personal property which is normally used for personal, family,
or household purposes, or (2) anything designed or sold for incorporation
into a dwelling.  In determining whether a product is a consumer product,
doubtful cases shall be resolved in favor of coverage.  For a particular
product received by a particular user, "normally used" refers to a
typical or common use of that class of product, regardless of the status
of the particular user or of the way in which the particular user
actually uses, or expects or is expected to use, the product.  A product
is a consumer product regardless of whether the product has substantial
commercial, industrial or non-consumer uses, unless such uses represent
the only significant mode of use of the product.

  "Installation Information" for a User Product means any methods,
procedures, authorization keys, or other information required to install
and execute modified versions of a covered work in that User Product from

a modified version of its Corresponding Source.  The information must
suffice to ensure that the continued functioning of the modified object
code is in no case prevented or interfered with solely because
modification has been made.

   If you convey an object code work under this section in, or with, or
specifically for use in, a User Product, and the conveying occurs as
part of a transaction in which the right of possession and use of the
User Product is transferred to the recipient in perpetuity or for a
fixed term (regardless of how the transaction is characterized), the
Corresponding Source conveyed under this section must be accompanied
by the Installation Information.  But this requirement does not apply
if neither you nor any third party retains the ability to install
modified object code on the User Product (for example, the work has
been installed in ROM).

   The requirement to provide Installation Information does not include a
requirement to continue to provide support service, warranty, or updates
for a work that has been modified or installed by the recipient, or for
the User Product in which it has been modified or installed.  Access to a
network may be denied when the modification itself materially and
adversely affects the operation of the network or violates the rules and
protocols for communication across the network.

   Corresponding Source conveyed, and Installation Information provided,
in accord with this section must be in a format that is publicly
documented (and with an implementation available to the public in
source code form), and must require no special password or key for
unpacking, reading or copying.

   7. Additional Terms.

   "Additional permissions" are terms that supplement the terms of this
License by making exceptions from one or more of its conditions.
Additional permissions that are applicable to the entire Program shall
be treated as though they were included in this License, to the extent
that they are valid under applicable law.  If additional permissions
apply only to part of the Program, that part may be used separately
under those permissions, but the entire Program remains governed by
this License without regard to the additional permissions.

   When you convey a copy of a covered work, you may at your option
remove any additional permissions from that copy, or from any part of
it.  (Additional permissions may be written to require their own
removal in certain cases when you modify the work.)  You may place
additional permissions on material, added by you to a covered work,
for which you have or can give appropriate copyright permission.

   Notwithstanding any other provision of this License, for material you
add to a covered work, you may (if authorized by the copyright holders of

**Exhibit F**
**Page 43**

that material) supplement the terms of this License with terms:

    a) Disclaiming warranty or limiting liability differently from the terms of sections 15 and 16 of this License; or

    b) Requiring preservation of specified reasonable legal notices or author attributions in that material or in the Appropriate Legal Notices displayed by works containing it; or

    c) Prohibiting misrepresentation of the origin of that material, or requiring that modified versions of such material be marked in reasonable ways as different from the original version; or

    d) Limiting the use for publicity purposes of names of licensors or authors of the material; or

    e) Declining to grant rights under trademark law for use of some trade names, trademarks, or service marks; or

    f) Requiring indemnification of licensors and authors of that material by anyone who conveys the material (or modified versions of it) with contractual assumptions of liability to the recipient, for any liability that these contractual assumptions directly impose on those licensors and authors.

  All other non-permissive additional terms are considered "further restrictions" within the meaning of section 10.  If the Program as you received it, or any part of it, contains a notice stating that it is governed by this License along with a term that is a further restriction, you may remove that term.  If a license document contains a further restriction but permits relicensing or conveying under this License, you may add to a covered work material governed by the terms of that license document, provided that the further restriction does not survive such relicensing or conveying.

  If you add terms to a covered work in accord with this section, you must place, in the relevant source files, a statement of the additional terms that apply to those files, or a notice indicating where to find the applicable terms.

  Additional terms, permissive or non-permissive, may be stated in the form of a separately written license, or stated as exceptions; the above requirements apply either way.

  8. Termination.

  You may not propagate or modify a covered work except as expressly provided under this License.  Any attempt otherwise to propagate or modify it is void, and will automatically terminate your rights under this License (including any patent licenses granted under the third

paragraph of section 11).

   However, if you cease all violation of this License, then your
license from a particular copyright holder is reinstated (a)
provisionally, unless and until the copyright holder explicitly and
finally terminates your license, and (b) permanently, if the copyright
holder fails to notify you of the violation by some reasonable means
prior to 60 days after the cessation.

   Moreover, your license from a particular copyright holder is
reinstated permanently if the copyright holder notifies you of the
violation by some reasonable means, this is the first time you have
received notice of violation of this License (for any work) from that
copyright holder, and you cure the violation prior to 30 days after
your receipt of the notice.

   Termination of your rights under this section does not terminate the
licenses of parties who have received copies or rights from you under
this License.  If your rights have been terminated and not permanently
reinstated, you do not qualify to receive new licenses for the same
material under section 10.

   9. Acceptance Not Required for Having Copies.

   You are not required to accept this License in order to receive or
run a copy of the Program.  Ancillary propagation of a covered work
occurring solely as a consequence of using peer-to-peer transmission
to receive a copy likewise does not require acceptance.  However,
nothing other than this License grants you permission to propagate or
modify any covered work.  These actions infringe copyright if you do
not accept this License.  Therefore, by modifying or propagating a
covered work, you indicate your acceptance of this License to do so.

   10. Automatic Licensing of Downstream Recipients.

   Each time you convey a covered work, the recipient automatically
receives a license from the original licensors, to run, modify and
propagate that work, subject to this License.  You are not responsible
for enforcing compliance by third parties with this License.

   An "entity transaction" is a transaction transferring control of an
organization, or substantially all assets of one, or subdividing an
organization, or merging organizations.  If propagation of a covered
work results from an entity transaction, each party to that
transaction who receives a copy of the work also receives whatever
licenses to the work the party's predecessor in interest had or could
give under the previous paragraph, plus a right to possession of the
Corresponding Source of the work from the predecessor in interest, if
the predecessor has it or can get it with reasonable efforts.

You may not impose any further restrictions on the exercise of the
rights granted or affirmed under this License.  For example, you may
not impose a license fee, royalty, or other charge for exercise of
rights granted under this License, and you may not initiate litigation
(including a cross-claim or counterclaim in a lawsuit) alleging that
any patent claim is infringed by making, using, selling, offering for
sale, or importing the Program or any portion of it.

  11. Patents.

  A "contributor" is a copyright holder who authorizes use under this
License of the Program or a work on which the Program is based.  The
work thus licensed is called the contributor's "contributor version".

  A contributor's "essential patent claims" are all patent claims
owned or controlled by the contributor, whether already acquired or
hereafter acquired, that would be infringed by some manner, permitted
by this License, of making, using, or selling its contributor version,
but do not include claims that would be infringed only as a
consequence of further modification of the contributor version.  For
purposes of this definition, "control" includes the right to grant
patent sublicenses in a manner consistent with the requirements of
this License.

  Each contributor grants you a non-exclusive, worldwide, royalty-free
patent license under the contributor's essential patent claims, to
make, use, sell, offer for sale, import and otherwise run, modify and
propagate the contents of its contributor version.

  In the following three paragraphs, a "patent license" is any express
agreement or commitment, however denominated, not to enforce a patent
(such as an express permission to practice a patent or covenant not to
sue for patent infringement).  To "grant" such a patent license to a
party means to make such an agreement or commitment not to enforce a
patent against the party.

  If you convey a covered work, knowingly relying on a patent license,
and the Corresponding Source of the work is not available for anyone
to copy, free of charge and under the terms of this License, through a
publicly available network server or other readily accessible means,
then you must either (1) cause the Corresponding Source to be so
available, or (2) arrange to deprive yourself of the benefit of the
patent license for this particular work, or (3) arrange, in a manner
consistent with the requirements of this License, to extend the patent
license to downstream recipients.  "Knowingly relying" means you have
actual knowledge that, but for the patent license, your conveying the
covered work in a country, or your recipient's use of the covered work
in a country, would infringe one or more identifiable patents in that
country that you have reason to believe are valid.

If, pursuant to or in connection with a single transaction or
arrangement, you convey, or propagate by procuring conveyance of, a
covered work, and grant a patent license to some of the parties
receiving the covered work authorizing them to use, propagate, modify
or convey a specific copy of the covered work, then the patent license
you grant is automatically extended to all recipients of the covered
work and works based on it.

A patent license is "discriminatory" if it does not include within
the scope of its coverage, prohibits the exercise of, or is
conditioned on the non-exercise of one or more of the rights that are
specifically granted under this License.  You may not convey a covered
work if you are a party to an arrangement with a third party that is
in the business of distributing software, under which you make payment
to the third party based on the extent of your activity of conveying
the work, and under which the third party grants, to any of the
parties who would receive the covered work from you, a discriminatory
patent license (a) in connection with copies of the covered work
conveyed by you (or copies made from those copies), or (b) primarily
for and in connection with specific products or compilations that
contain the covered work, unless you entered into that arrangement,
or that patent license was granted, prior to 28 March 2007.

Nothing in this License shall be construed as excluding or limiting
any implied license or other defenses to infringement that may
otherwise be available to you under applicable patent law.

12. No Surrender of Others' Freedom.

If conditions are imposed on you (whether by court order, agreement or
otherwise) that contradict the conditions of this License, they do not
excuse you from the conditions of this License.  If you cannot convey a
covered work so as to satisfy simultaneously your obligations under this
License and any other pertinent obligations, then as a consequence you may
not convey it at all.  For example, if you agree to terms that obligate you
to collect a royalty for further conveying from those to whom you convey
the Program, the only way you could satisfy both those terms and this
License would be to refrain entirely from conveying the Program.

13. Remote Network Interaction; Use with the GNU General Public License.

Notwithstanding any other provision of this License, if you modify the
Program, your modified version must prominently offer all users
interacting with it remotely through a computer network (if your version
supports such interaction) an opportunity to receive the Corresponding
Source of your version by providing access to the Corresponding Source
from a network server at no charge, through some standard or customary
means of facilitating copying of software.  This Corresponding Source
shall include the Corresponding Source for any work covered by version 3
of the GNU General Public License that is incorporated pursuant to the

following paragraph.

   Notwithstanding any other provision of this License, you have
permission to link or combine any covered work with a work licensed
under version 3 of the GNU General Public License into a single
combined work, and to convey the resulting work.  The terms of this
License will continue to apply to the part which is the covered work,
but the work with which it is combined will remain governed by version
3 of the GNU General Public License.

   14. Revised Versions of this License.

   The Free Software Foundation may publish revised and/or new versions of
the GNU Affero General Public License from time to time.  Such new versions
will be similar in spirit to the present version, but may differ in detail to
address new problems or concerns.

   Each version is given a distinguishing version number.  If the
Program specifies that a certain numbered version of the GNU Affero General
Public License "or any later version" applies to it, you have the
option of following the terms and conditions either of that numbered
version or of any later version published by the Free Software
Foundation.  If the Program does not specify a version number of the
GNU Affero General Public License, you may choose any version ever published
by the Free Software Foundation.

   If the Program specifies that a proxy can decide which future
versions of the GNU Affero General Public License can be used, that proxy's
public statement of acceptance of a version permanently authorizes you
to choose that version for the Program.

   Later license versions may give you additional or different
permissions.  However, no additional obligations are imposed on any
author or copyright holder as a result of your choosing to follow a
later version.

   15. Disclaimer of Warranty.

   THERE IS NO WARRANTY FOR THE PROGRAM, TO THE EXTENT PERMITTED BY
APPLICABLE LAW.  EXCEPT WHEN OTHERWISE STATED IN WRITING THE COPYRIGHT
HOLDERS AND/OR OTHER PARTIES PROVIDE THE PROGRAM "AS IS" WITHOUT WARRANTY
OF ANY KIND, EITHER EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO,
THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR
PURPOSE.  THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THE PROGRAM
IS WITH YOU.  SHOULD THE PROGRAM PROVE DEFECTIVE, YOU ASSUME THE COST OF
ALL NECESSARY SERVICING, REPAIR OR CORRECTION.

   16. Limitation of Liability.

   IN NO EVENT UNLESS REQUIRED BY APPLICABLE LAW OR AGREED TO IN WRITING

WILL ANY COPYRIGHT HOLDER, OR ANY OTHER PARTY WHO MODIFIES AND/OR CONVEYS
THE PROGRAM AS PERMITTED ABOVE, BE LIABLE TO YOU FOR DAMAGES, INCLUDING ANY
GENERAL, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE
USE OR INABILITY TO USE THE PROGRAM (INCLUDING BUT NOT LIMITED TO LOSS OF
DATA OR DATA BEING RENDERED INACCURATE OR LOSSES SUSTAINED BY YOU OR THIRD
PARTIES OR A FAILURE OF THE PROGRAM TO OPERATE WITH ANY OTHER PROGRAMS),
EVEN IF SUCH HOLDER OR OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF
SUCH DAMAGES.

  17. Interpretation of Sections 15 and 16.

  If the disclaimer of warranty and limitation of liability provided
above cannot be given local legal effect according to their terms,
reviewing courts shall apply local law that most closely approximates
an absolute waiver of all civil liability in connection with the
Program, unless a warranty or assumption of liability accompanies a
copy of the Program in return for a fee.

                     END OF TERMS AND CONDITIONS

            How to Apply These Terms to Your New Programs

  If you develop a new program, and you want it to be of the greatest
possible use to the public, the best way to achieve this is to make it
free software which everyone can redistribute and change under these terms.

  To do so, attach the following notices to the program.  It is safest
to attach them to the start of each source file to most effectively
state the exclusion of warranty; and each file should have at least
the "copyright" line and a pointer to where the full notice is found.

    <one line to give the program's name and a brief idea of what it does.>
    Copyright (C) <year>  <name of author>

    This program is free software: you can redistribute it and/or modify
    it under the terms of the GNU Affero General Public License as published
    by the Free Software Foundation, either version 3 of the License, or
    (at your option) any later version.

    This program is distributed in the hope that it will be useful,
    but WITHOUT ANY WARRANTY; without even the implied warranty of
    MERCHANTABILITY or FITNESS FOR A PARTICULAR PURPOSE.  See the
    GNU Affero General Public License for more details.

    You should have received a copy of the GNU Affero General Public License
    along with this program.  If not, see <http://www.gnu.org/licenses/>.

Also add information on how to contact you by electronic and paper mail.

  If your software can interact with users remotely through a computer

network, you should also make sure that it provides a way for users to
get its source.  For example, if your program is a web application, its
interface could display a "Source" link that leads users to an archive
of the code.  There are many ways you could offer source, and different
solutions will be better for different programs; see section 13 for the
specific requirements.

  You should also get your employer (if you work as a programmer) or school,
if any, to sign a "copyright disclaimer" for the program, if necessary.
For more information on this, and how to apply and follow the GNU AGPL, see
<http://www.gnu.org/licenses/>.

# EXHIBIT G

# Casper CBC
A python implementation of a class of ["correct-by-construction" consensus protocols](https://github.com/ethereum/research/tree/master/papers/cbc-consensus). Currently, this includes Casper the Friendly Ghost (a blockchain consensus protocol) and Casper the Friendly Binary Consensus Protocol.

Specifications for these protocols can be found here [here](https://github.com/ethereum/research/tree/master/papers/CasperTFG), but the implementation and the spec may deviate from the spec, as they are still moving targets.

### Warning -- Codebase subject to substantial changes
This pre v1.0 implementation is under active development and experimentation and might experience _significant_ organizational and substantive changes. If you use components of this codebase, _expect_ breaking changes to be introduced.

That said, we will try to detail any breaking changes in subsequent releases.

Branch    | Tests
----------|------
master    |
[![CircleCI](https://circleci.com/gh/ethereum/cbc-casper/tree/master.svg?style=svg&circle-token=071bd3b625fc240222d1add41dc796ec8bee077d)](https://circleci.com/gh/ethereum/cbc-casper/tree/master)
develop   |
[![CircleCI](https://circleci.com/gh/ethereum/cbc-casper/tree/develop.svg?style=svg&circle-token=071bd3b625fc240222d1add41dc796ec8bee077d)](https://circleci.com/gh/ethereum/cbc-casper/tree/develop)

## Requirements
* Python 3
* ubuntu/debian: `sudo apt-get install python3-dev python3-venv python3-tk`
* OSX via Homebrew: `brew install python3`

## Developer Setup
If you would like to hack on cbc-casper or run the simulations yourself, setup your dev environment with:

```
make install
```

## Run Simulations
### Standard
Standard simulations are marked up for use as follows:

NOTE: after each viewgraph appears, you must manually exit the window for the simulation to continue to run!

**Exhibit G**
**Page 52**

```
make run-[rand | rrob | full | nofinal | binary]
```

`rand:` each round, some randomly selected validators propagate their most recent message to other randomly selected validators, who then create new messages.

`rrob:` each round, the creator of the last round's block sends it to the next receiver, who then creates a block.

`full:` each round, all validators receive all other validators previous messages, and then all create messages.

`nofinal:` each round, two simultaneous round-robin message propagations occur at the same time. This results in validators never being able to finalize later blocks (they may finalize initial blocks, depending on weight distribution).

`binary:` unlike the above message propagation schemes, this changes the protocol to cbc-casper with binary data structures! Instead of a blockchain, this protocol just comes to consensus on a single bit.

The number of validators, the number of messages that propagate per round, and the report interval can be edited in `casper/settings.py`.

### Advanced
Advanced simulations can be run with a little command line wizardy.
- First ensure that you are using the virtual environment via: `. venv/bin/activate`
- Simulations can then be run via `casper.py`. The following are example usages:
```
# run a simulation with 100 validators and random message propagation
python casper.py rand --validators 100

# run a simulation without displaying the viewgraphs, but instead save them and
create a GIF
python casper.py rand --hide-display --save

# run a simulation with 20 validators and 1000 rounds of round robin message
propagation,
# reporting every 100 rounds
python casper.py rrob --validators 6 --rounds 300 --report-interval 100

# get help and all options for casper.py
python casper.py --help
```

## Write Simulations
Simulations can be created/managed by `SimulationRunner`. See `casper.py` for sample usage.

More sample simulations with data collection will be added soon.

## Run Experiments
An Experiment runs a type of simulation some number of times, collects some
specified data on on each simulation and on aggregate of the simulations and
outputs the results in `.json` and `.csv ` formats for further analysis and
visualizations.
Experimental output is written to `out/{experiment_name-timestamp}/`

The parameters of an experiment are specified via a `.json` file and are run
using the python script, `run_experiment.py`. For example:

```
python run_experiment.py experiments/orphan_rate.json
```

The following are the fields that make up an experiment to be defined in a `.json`
file:

`msg_mode` (string): Specifies the message generation/propagation scheme. The
available schemes are "rand", "rrob", "full", and "nofinal".

`protocol` (string): Specifies the protocol to test. Available protocols are
"blockchain" and "binary" (for now!).

`num_simulations` (number): Specifies the number of simulations to run. Each
simulation starts with a fresh setup -- messages, validators, etc.

`rounds_per_sim` (number): Specifies the number of rounds of the message
propagation scheme to run per simulation.

`report_interval` (number): Specifies at which intervals of the message
propagation to collect data. For example, if `rounds_per_sim` is 100 and
`report_interval` is 20,
the experiment will collect data at round 20, 40, 60, 80, and 100.

`data` (list): Specifies which types of data to collect from the simulations as
strings. The available types of data are the methods of `Analyzer`. New types of
data
can be added by simply adding a method to Analyzer and referencing the method
name in `data` of an experiment.

`validator_info` (object): Specifies the parameters for generating a validator
set for each simulation.

`validator_info.gen_type` (string): Specifies the type of validator generation
scheme. The available schemes are "gauss" and "weights".

`validator_info.num_validators` (number): [*only "gauss" `gen_type`*]
Specifies the number of validators per validator set.

`validator_info.mu` (number): [*only "gauss" `gen_type`*]
Specifies the mean of the gaussian distribution used to generate validator weights.

`validator_info.sigma` (number): [*only "gauss" `gen_type`*]
Specifies the standard deviation of the gaussian distribution used to generate
validator weights.

`validator_info.min_weight` (number): [*only "gauss" `gen_type`*]
Specifies the absolute minimum validator weight can result from the "gauss"
`gen_type`

`validator_info.weights` (array): [*only "weights" `gen_type`*]
Specifies an explicit set of validator weights to be used in each simulation.
It is formatted as a json array with positive numbers as values.

## Run Tests
To run all tests:

```
make test
```

To run a specific test, use (or the equivalent for whatever test you wish to run)

```
make test TEST=tests/test_safety_oracle.py
```

To run tests with visualizations:
```
make test-with-reports
```

Note: each view graph must be closed for the tests to continue running.

# EXHIBIT H

# Casper the Friendly Ghost
## A "Correct-by-Construction" Blockchain Consensus Protocol

**DRAFT v0.1**

**Vlad Zamfir**
Ethereum Foundation

## Abstract

We present a specification and limited experimental observations of a blockchain-based consensus protocol, "Casper the Friendly Ghost."

The protocol uses an adaptation of Y. Sompolinsky and A. Zohar's Greedy Heaviest Observed Sub-tree (GHOST) [1] as a "fork-choice rule." It is able to finalize/decide on blocks with asynchronous and Byzantine fault tolerant consensus safety. It allows blocks to be finalized while the network operates with the network overhead of the Bitcoin blockchain, with each node receiving $\mathcal{O}(1)$ messages/block. This is in contrast to the $\mathcal{O}(N)$ traditionally required for Byzantine fault tolerant state machine replication.

For pedagogical reasons, we first specify a binary consensus protocol (which decides on a bit, 0 or 1). This binary consensus protocol satisfies the same consensus safety proof as the blockchain consensus protocol and is therefore very similar to the blockchain consensus protocol.

# 1. Introduction

Consensus protocols are used by nodes in distributed systems to decide on the same consensus values, or on the same list of inputs to a replicated state machine. This is a challenging problem due to both network latency and the presence of faulty nodes. Arbitrary network latency, for example, means that nodes recieve distinct sets of messages, while the messages that they each receive may arrive in different orders. Faulty nodes may go offline, or they may behave in an arbitrary manner.

There are, roughly speaking, two broad classes of consensus protocols known today. One we refer to as "traditional consensus". This class has its "genetic roots" in Paxos and multi-Paxos, and in the "traditional" consensus protocol research from the 80s and 90s [2]. The other we refer to as "blockchain consensus". These are protocols that have their roots in the Bitcoin blockchain and Satoshi Nakamoto's whitepaper [3]. We first discuss the differences between these classes of protocols. Then we give an overview of the safety proof that the protocols given in this document satisfy, and finally we present the specifications of the protocols at hand.

## 1.1. Comparing Traditional Consensus To Blockchain Consensus

Traditional consensus protocols (such as multi-Paxos [4] and pbft [**?**]) are notoriously difficult to understand.[4] Blockchain consensus protocols, on the other hand, are much more accessible. This difference comes at least in part from the relative simplicity of Bitcoin's specification.

In the context of state machine replication, traditional protocols decide (with irrevocable finality) on one "block" of state transitions/transactions to add to the shared operation log at a time.[4] To decide on a block, a node must receive $\mathcal{O}(N)$ messages, where $N$ is the number of consensus-forming nodes.[**?**]

Blockchain consensus protocols like Bitcoin do not finalize/decide on one block at a time.[3] In fact, the Bitcoin blockchain in particular does not make "finalized decisions" at all; blocks are "orphaned" if/when they are not in the highest total difficulty chain. [?] However, if the miners are able to mine on the same blockchain, then the blocks that get deep enough into the blockchain won't be reverted ("orphaned"). A block's depth in the blockchain therefore serves as a proxy for finalization. In the average case for blockchain consensus protocols, each node only requires approximately one message, $\mathcal{O}(1)$, for every block. [1]

Traditional consensus protocol research has focused on producing protocols that are asynchronously safe (i.e. blocks won't be reverted due to arbitrary timing of future events) and live in asynchrony (or partial synchrony) (i.e. nodes eventually decide on new blocks) [?]. On the other hand, the Bitcoin blockchain is not safe in an asynchonous network but is safe and live (for unknown block-depth or "confirmation count") in a "partially synchronous network".

Traditional Byzantine fault tolerant consensus protocols have precisely stated Byzantine fault tolerance numbers (often they can tolerate less than a third of Byzantine faults, or up to $t$ faults when there are $3t + 1$ nodes)[CITE]. On the other hand, it is less clear exactly how many faults (measured as a proportion of hashrate) the Bitcoin blockchain protocol can tolerate.

## 1.2. Overview of the Work Presented

We give the specification of a consensus protocol, "Casper the Friendly Ghost," which has both the low overhead of blockchain consensus protocols and the asynchronous Byzantine fault tolerant safety normally associated with traditional consensus protocols. However, before we share the blockchain consensus protocol, we give the specification of a binary consensus protocol (which chooses between $0$ and $1$ with asynchronous, Byzantine fault tolerant safety).

Understanding the binary consensus protocol makes it much easier to understand the blockchain consensus protocol; the protocols are remarkably similar. They are so similar because they are both "generated" in order to satisfy the same consensus safety proof.

This process for choosing the protocol specification is not specified or justified here, but rather in another, more abstract, paper[CITE]. This paper lacks information about *why exactly* certain choices were made or *how exactly* certain claims are proven. Even without the full scope of the "process paper," our aim is to provide the reader with clear intuitions about why/how the blockchain protocol works. We therefore give a high level sketch of the safety proof which these protocols satisfy. Then, we present the promised protocols.

## 1.3. Consensus Safety Proof

Each of the protocols presented satisfies the same consensus safety proof. (And indeed, any consensus protocol generated by the correct-by-construction process[2] satisfies the same proof.)

We assume that nodes running the consensus protocol have (local) states in $\Sigma$. These states have directional paths called "protocol executions" or "protocol state transitions" between them. We write $\sigma \to \sigma'$ if there is an execution from $\sigma$ to $\sigma'$. Additionally, the paths are composable: if $\sigma \to \sigma'$ and $\sigma' \to \sigma''$, then there is also an execution $\sigma \to \sigma''$.

The proof refers to an "estimator," which maps protocol states to propositions about the consensus. In the binary consensus, the estimator maps protocol states to $0$ or $1$. In the blockchain consensus, on the other hand, the estimator maps protocol states to a blockchain (functioning as our "fork choice").

An estimate in the binary consensus ($0$ or $1$) is said to be "safe" (have "estimate safety") for a particular protocol state if it is returned by the estimator on all future protocol states[3]. In the blockchain consensus, a block is said to be "safe" for a particular protocol state if it is also in the fork choice for all future protocol states.

---

[1]For Bitcoin, refer to [3], section 5 on pp. 34.

[2]See our related paper – PAPER

[3]I.e. all states accessible from that state through any valid protocol execution.

2

The consensus safety proof shows that decisions on safe estimates have consensus safety (as long as there are not more than $t$ Byzantine faults). Consensus safe decisions have the following property: any decisions made on safe estimates by a protocol following node will be *consistent* with decisions made on safe estimates by any other protocol following node.

The proof relies on the following key result: If node 1 with state $\sigma_1$ has safe estimate $e_1$ and another node 2 with state $\sigma_2$ has safe estimate $e_2$, *and if they have a future state in common* $\sigma_3$, then node 1 and node 2's decisions on $e_1$ and $e_2$ are consistent. The result is quite simple as it follows without much work from the definition of estimate safety. Specifically, if a state $\sigma$ has a safe estimate $e$, then any future protocol state of $\sigma$, $\sigma'$, is also safe on $e$. So if our states $\sigma_1$ and $\sigma_2$ (with safety on $e_1$ and $e_2$) share a common future, then that future has to be safe on both $e_1$ *and* $e_2$, which means that they are consistent. So this first part of the proof shows that decisions on safe estimates are consensus safe *for any pair of nodes who have a future protocol state in common*.

Next we aim to construct protocols ("protocol states" with "state transitions") which guarantee that nodes have a common future protocol states unless there are more than $t$ Byzantine faults. Such a protocol has consensus safety if there are not more than $t$ such faults, from the result we just discussed. We accomplish this in a few steps.

First, we assume that protocol states are sets of protocol messages and then insist that the union $\sigma_1 \cup \sigma_2$ of any two protocol states $\sigma_1$ and $\sigma_2$ is itself a protocol state. Further, we insist that there is a state transition from each protocol state $\sigma$ to $\sigma' \supset \sigma$ (any superset of $\sigma$). This means that $\sigma_1 \cup \sigma_2$ is a protocol future of $\sigma_1$ and $\sigma_2$.

This assumption by itself allows for any two states to always have a common future state, which by itself guarantees consensus safety of decisions on safe estimates. But there's a problem: such a protocol fails to satisfy the *non-triviality* property of consensus. Non-triviality means that the protocol is able to choose between mutually exclusive values. In our context, non-triviality means that there are two protocol states $\sigma_1$ and $\sigma_2$ that are each safe on two mutually exclusive estimates. Two protocol states with mutually exclusive safe estimates cannot have a common future, but we just insisted that $\sigma_1 \cup \sigma_2$ would be such a common future. This contradiction means that we have not yet satisfied non-triviality, as claimed.

Instead, we must be certain that $\sigma_1$ and $\sigma_2$ have common a future *only as long as there are less than $t$ Byzantine faults in $\sigma_1 \cup \sigma_2$*. This allows for states without shared protocol futures (allowing non-triviality) but still allows for consensus safety from our previous result (although now only as long as there are less than $t$ Byzantine faults).

So our next step is to present a process that counts "the number of Byzantine faults" that are evidenced in any given protocol state. In the final step we define a "new version" of our initial protocol by excluding states with more than $t$ such faults, using the process from the previous step.

And indeed, both of the protocols specified here have the property that the union of any pair of protocol states $\sigma_1$ and $\sigma_2$, $\sigma_1 \cup \sigma_2$, is a protocol state if and only if it does not have more than $t$ Byzantine faults. Thus, two nodes who decide on safe estimates have consensus safety if there is less than $t$ Byzantine faults, and all this required saying almost nothing about the estimator! :)

## 2. Casper the Friendly Binary Consensus

We now specify the Binary consensus protocol by first defining protocol messages and then defining the estimator (which maps sets of protocol messages to 0 or 1). We present a way to detect and count Byzantine faults and subsequently define Casper the Friendly Binary Consensus's "protocol states" as sets of messages that exhibit up to $t$ Byzantine faults. Then we define the protocol's "state transitions", and finally, we define binary estimate safety. These definitions satisfy those in the consensus safety proof for decisions on safe estimates.

The definition of "protocol messages" is parametric in a set of "validator names" $\mathcal{V}$, which are identified as the names of the consensus forming nodes.

3

**Exhibit H**
**Page 59**

Protocol messages have three parts. An "estimate" (a 0 or a 1), a "sender" (a validator name), and a "justification". The justification is itself a set of protocol messages. Validators use these protocol messages to update each other on their current estimates. Further, the estimate values are not arbitrary because a protocol message is "valid" only if the "estimate" is the result of applying the estimator on the message's "justification".

The definitions of the estimator and of validity appear later. For now, we denote the set of all possible protocol messages in the binary consensus protocol as $\mathcal{M}$, and define it as follows:

**Definition 2.1** (Protocol Messages, $\mathcal{M}$)**.**

$$\mathcal{M}_0 = \{0, 1\} \times V \times \{\emptyset\}$$

$$\mathcal{M}_n = \{0, 1\} \times V \times \mathcal{P}(\bigcup_{i=0}^{n-1} \mathcal{M}_i)$$

$$\mathcal{M} = \lim_{n \to \infty} \bigcup_{i=0}^{n} \mathcal{M}_i$$

$\mathcal{M}_0$ is the "base case", the set of messages with "null justifications". $\mathcal{M}_n$ is the set of messages at "height" $n$, which have messages of height $n-1$ (and/or lower) in their justification. Note that messages $\mathcal{M}_0$ have height 0. $\mathcal{P}$ denotes the "power set" function. $\mathcal{P}$ denotes the "power set" function, which maps a set to the set of all of its subsets, so $\mathcal{P}(\bigcup_{i=0}^{n-1} \mathcal{M}_i)$ denotes all sets of protocol messages at height $n-1$ or lower.

The estimator is a function that maps sets of protocol messages to 0 or 1, or a null value denoted by $\emptyset$:

$$\mathcal{E} : \mathcal{P}(\mathcal{M}) \to \{0, 1\} \cup \{\emptyset\}$$

With the property that $\mathcal{E}(\emptyset) = \emptyset$. A protocol message $m$ is then said to be "valid" if either $\mathcal{E}(J(m)) = \emptyset$ or $E(m) = \mathcal{E}(J(m))$. From now on, we assume that $\mathcal{M}$ only contains valid messages.[4]

But before we can define the estimator, we need a few more basic definitions. We define $E$, a "helper function" that picks out the "estimate" given in a protocol message:

$$E(m) = e \iff m = (e, \_, \_)$$

Similarly, we define $V$ as a function that picks out the "sender", and $J$ as a function that picks out the "justification".

We say that message $m_1$ is "a dependency" of message $m_2$ and we write $m_1 \prec m_2$ if $m_1$ is in the justification of $m_2$, or if $m_1$ is in the justification of one of the messages in $m_2$'s justification, or if it is in the justification of a message in the justification of a message in the justification of $m_2$...

We also call $m_1$ a dependency of $m_2$ if $m_1 = m_2$:

**Definition 2.2** (dependency, $\prec$)**.**

$$m_1 \prec m_2 \iff m_1 = m_2 \text{ or } \exists m' \in J(m_2) \ . \ m_1 \prec m'$$

We define "the dependencies" of a message $m$ as all of the messages $m'$ such that $m' \prec m$. These are all the messages that can be accessed in the justifications, or in the justification of messages in justifications... etc.

---

[4] All protocol messages at height 0 are valid because they have null justifications and $\mathcal{E}(\emptyset) = \emptyset$. Then we can find the valid protocol messages at height 1 by applying the estimator to their justifications (which are sets of [valid] messages at height 0) for each message, only keeping valid messages. Similarly, we can find the valid protocol messages at height $n$ by applying the estimator to the justification of these messages (which are sets of valid messages at height $h < n$). We are thereby able to collect all valid protocol messages and restrict $\mathcal{M}$.

4

**Exhibit H**
**Page 60**

$$D(m) = \{m\} \cup \bigcup_{m' \in J(m)} D(m')$$

This definition can be extended in a natural way to define the dependencies of a set of messages (by taking the union of the dependencies of the individual messages).

If $m_1 \prec m_2$, then we also say that $m_2$ is "later" than $m_1$ and write $m_2 \succ m_1$.

We now have the language to talk about the latest message from a sender $v$ out of a set of messages $M$, which we denote as $L(v, M)$:

**Definition 2.3** (Latest message).

$$m \in L(v, M) \iff \nexists m' \in D(M) : V(m') = v \text{ and } m' \succ m$$

Latest messages are critical to defining the estimator, which returns 0 if "more" of the nodes have latest messages with estimate 0 than with estimate 1. We use "weights" for nodes to measure which estimate has "more" consensus forming nodes, implemented by a map from validator names to positive real numbers. We do this without loss of generality (because it's possible that all weights are equal).

$$W : V \to \mathbb{R}_+$$

Now we define the "score" of an estimate $e$ in a set of messages $M$ as the total weight of validators with latest messages with estimate $e$.

**Definition 2.4** (Score of a binary estimate).

$$\text{Score}(e, M) = \sum_{\substack{v \in V \\ :m \in L(v, M) \\ \text{with } E(m) = e}} W(v) \tag{1}$$

Finally, we define the estimator for the Binary consensus, it returns the estimate with the highest score, if there is one, otherwise it returns $\emptyset$.

**Definition 2.5** (Binary estimator).

$$\begin{align}
\mathcal{E}(M) &= 0 && \text{if } \text{Score}(0, M) > \text{Score}(1, M), \tag{2} \\
\mathcal{E}(M) &= 1 && \text{if } \text{Score}(1, M) > \text{Score}(0, M), \tag{3} \\
\mathcal{E}(M) &= \emptyset && \text{if } \text{Score}(1, M) = \text{Score}(0, M) \tag{4}
\end{align}$$

At this stage we have protocol messages and an estimator. If we can define a method for counting Byzantine faults from a set of protocol messages, then we can give the set of protocol states with their state transitions for a binary consensus protocol that tolerates $t$ Byzantine faults.

Each protocol message $m$ is supposed to represent a record of messages that were seen by validator $V(m)$. Any "correct" node has a growing record of messages that they have received and sent. Specifically, a correct node is never the sender of a pair of messages $m_1$ and $m_2$ such that neither $m_1 \prec m_2$ nor $m_1 \succ m_2$. We call such a pair of messages "an equivocation".

**Definition 2.6** (Equivocation).

$$Eq(m_1, m_2) \iff V(m_1) = V(m_2) \text{ and } m_1 \not\succ m_2 \text{ and } m_1 \not\prec m_2 \tag{5}$$

A sender $v$ with an equivocation in a set of protocol messages $M$, is said to be "Byzantine", or to have exhibited a "Byzantine fault" in $M$.

**Definition 2.7** (Byzantine faulty node).

$$B(v, M) \iff \exists m_1, m_2 \in D(M) : v = V(m_1) \wedge Eq(m_1, m_2) \tag{6}$$

5

**Exhibit H**
**Page 61**

We then define the Byzantine nodes visible in $M$ as

$$B(M) = \{v \in V : B(v, M)\}$$

The weight of Byzantine faults evidenced in a set of messages $M$ is the sum of the weights of validators who are Byzantine in $M$.

**Definition 2.8** (Fault weight).

$$F(M) = \sum_{v \in B(M)} W(v) \tag{7}$$

We now define our protocol states $\Sigma_t \subset \mathcal{P}(\mathcal{M})$ as the sets of protocol messages that exhibit less than $t$ faults, by weight:

**Definition 2.9** (Protocol States).

$$\Sigma_t = \{\sigma \subseteq \mathcal{M} : F(\sigma) \leq t\} \tag{8}$$

And we also define "protocol executions" as directed paths between states in $\Sigma_t$ such that an execution from $\sigma \in \Sigma_t$ to $\sigma' \in \Sigma_t$ exists if and only if $\sigma \subseteq \sigma'$. We write the existence of such a state transition as $\sigma \to \sigma'$.

**Definition 2.10** (Protocol Executions).

$$\forall \sigma, \sigma' \in \Sigma_t \quad : \sigma \to \sigma' \iff \sigma \subseteq \sigma' \tag{9}$$

Protocol executions compose ($\sigma \to \sigma' \wedge \sigma' \to \sigma'' \implies \sigma \to \sigma''$) because the improper subset relation ($\subseteq$) composes.

We can now give the definition of estimate safety for the Binary Consensus, for an estimate $e$ in a protocol state $\sigma$.

**Definition 2.11** (Binary Estimate Safety).

$$S_t(e, \sigma) \iff \forall \sigma' \in \Sigma_t : \sigma \to \sigma', \ e = \mathcal{E}(\sigma')$$

Because this construction satisfies the terms of our consensus safety proof, we know that decisions on such safe estimates in this protocol are consensus safe (if there are less than $t$ Byzantine faults (by weight)).

We have yet to discuss how nodes running the binary consensus protocol can detect when they are in a state with a safe estimate. We discuss this following the specification of the blockchain consensus protocol because we detect estimate safety in the same way for both protocols.

Now that we've covered the binary consensus protocol, it is much simpler to specify the blockchain consensus protocol.

## 3. Casper the Friendly Ghost

The specification of Casper the Friendly Ghost proceeds along *very* similar lines as Casper the Friendly Binary Consensus. In fact, we are able to reuse most of our definitions without any modification.

We again first define the set of all protocol messages and then the estimator, which this time is the Greedy Heaviest-observed Sub-tree (GHOST) "fork choice rule". Then, we define protocol states as sets of messages which exhibit up to $t$ Byzantine faults (by weight), and then we define the protocol's "state transitions". Finally, we define block estimate safety. These definitions satisfy those in the consensus safety proof for decisions on safe estimates.

Protocol messages are called "blocks" and have the same three components as the messages in the binary consensus protocol; an estimate, a sender and a justification. The estimate is a block, called "the prevblock"

6

or "the parent block". For valid messages, the estimate is the block on the head of the blockchain chosen by the GHOST fork choice rule in the justification. The "sender" (a validator name) field is defined precisely as before. Finally, the justification is again simply a set of protocol messages.

Formally, in Casper the Friendly Ghost we have protocol messages, $\mathcal{M}$, with the following form (again parametric in a set of validator names, $\mathcal{V}$):

**Definition 3.1** (Blocks)**.**

$$\text{Genesis Block} = \{\emptyset\}$$
$$\mathcal{M}_0 = \{\text{Genesis Block}\} \times V \times \{\text{Genesis Block}\}$$
$$\mathcal{M}_n = \bigcup_{i=0}^{n-1} \mathcal{M}_i \times V \times \mathcal{P}(\bigcup_{i=0}^{n-1} \mathcal{M}_i)$$
$$\mathcal{M} = \{\text{Genesis Block}\} \cup \lim_{n \to \infty} \bigcup_{i=0}^{n} \mathcal{M}_i$$

The definitions of the "helper functions" ($E$, $V$, and $J$), "dependency", "later", "latest messages", and "validator weights" given in the previous section binary consensus are defined *precisely* in the same way here. We therefore use them without giving the definitions again.

We do need a couple of new terms, though, to define the fork choice rule. We write $b_1 \downarrow b_2$ and say that block $b_1$ is "in the blockchain" of block $b_2$, if

**Definition 3.2** (Blockchain membership, $b_1 \downarrow b_2$)**.**

$$b_1 \downarrow b_2 \iff b_1 = b_2 \text{ or } b_1 \downarrow E(b_2) \tag{10}$$

We define the "score" of a block $b$ given a set of protocol messages $M$ as the total weight of validators with latest blocks $b'$ such that $b \downarrow b'$.

**Definition 3.3** (Score of a block)**.**

$$\text{Score}(b, M) = \sum_{\substack{v \in V \\ m \in L(v, M) \\ b \downarrow E(m)}} W(v) \tag{11}$$

The "children" of a block $b$ in a set of protocol messages $M$ are the blocks with $b$ as their prevblock.

$$C(b, M) = \{b' \in M : E(b') = b\}$$

We now have the language required to define the estimator for the blockchain consensus, the Greedy Heaviest-Observed Sub-Tree rule!

**Definition 3.4** (The Greedy Heaviest-Observed Sub-Tree (GHOST) fork-choice rule, $\mathcal{E}$)**.**

**Data:** A set of blocks, $M$
**Result:** The block at the head of the fork choice
$b = \text{Genesis Block}$
**while** *$b$ has children ($C(b, M)$ is nonempty)* **do**
    scores = dict()
    **for** *each child of block $b$, $b' \in C(b, M)$* **do**
        scores[$b'$] = Score($b'$, $M$)
    **end**
    **if** *scores has a unique maximum* **then**
        $b$ = argmax(scores)
    **else**
        $b$ = the max score block with the lowest hash
    **end**
**end**
**return** $b$

**Algorithm 1:** The Greedy Heaviest-Observed Sub-tree Fork-choice rule, $\mathcal{E}$

7

**Exhibit H**
**Page 63**

We assume that "hash" has the property that out of any set of blocks, only one has the lowest hash. Using the hashes of blocks to eliminate "ties" means that the estimator for the blockchain consensus never outputs an exception. Previously the binary estimator return $\emptyset$ when 0 and 1 had the same score. This means that a message $m$ is valid if $E(m) = \mathcal{E}(J(m))$, and just as in the binary consensus we insist that all the blocks are valid. [5]

"Equivocation", "Byzantine faulty", "fault weight", "protocol states", and "protocol executions" are defined here in *precisely* the same way as in the binary consensus. We therefore do not give the definitions again.

We can now give the definition of estimate safety for Casper the Friendly Ghost, for a block $b$ in a protocol state $\sigma$.

**Definition 3.5** (Blockchain Estimate Safety).

$$S_t(b, \sigma) \iff \forall \sigma' \in \Sigma_t : \sigma \to \sigma', \ b \downarrow \mathcal{E}(\sigma')$$

Because this construction satisfies the terms of our consensus safety proof, we know that decisions on safe estimates in this protocol are consensus safe (if there are less than $t$ Byzantine faults (by weight)).

We now present a mechanism that nodes can use to detect which of their estimates are safe in both the binary and the blockchain consensus.

# 4. A Simple Safety Oracle

Estimate safety is parametric in some protocol state $\sigma$ and is a property of all its future protocol states. The challenge with estimate safety is that there are (at least in our cases) an infinite number of possible future protocol states, yet nodes somehow need to make a determination about whether or not an estimate is safe in a finite (ideally very short) amount of time.

Estimate safety is also parametric in a value of the estimate which is somehow invariant in the estimator $\mathcal{E}$ over these future states. We refer to the estimate whose safety is being determined as "the candidate estimate."

An "ideal adversary" returns an "attack", a future protocol state $\sigma'$ such that $\sigma \to \sigma'$, with an estimator $\mathcal{E}(\sigma')$ that "disagrees" with the candidate estimate if and only if such a protocol state exists in $\Sigma_t$. We might imagine that such an adversary would be strategic about which possible future states they search. An "ideal safety oracle" would indicate safety whenever the ideal adversary fails to find an attack.

If we can detect *only some* of the circumstances in which the ideal adversary fails to find an attack, then we can construct a safety oracle which is able to detect safety in some of the states with estimate safety. Due to efficiency considerations, the cases may be available enough for it to be useful in an implementation even though it may not be an ideal safety oracle.

We identify such a set of circumstances. To discuss more generally, we denote "agreement" between estimate $e$ and estimate $e'$ as $e \equiv e'$. This corresponds to $e = e'$ in the binary consensus, and $e \downarrow e'$ in the blockchain consensus. Disagreement will be denoted with $\not\equiv$.

We say that validator $v_i$ "sees validator $v_j$ agreeing with estimate $e$ in a set of protocol messages $M$" if:

- $v_i$ has exactly one latest message in $M$ (we are denoting this message as $L(v_i, M)$)
- $v_j$ has exactly one latest message in the justification of $v_i$'s latest message, $J(L(v_i, M))$ (which we denote as $L(v_j, J(L(v_i, M)))$)
- This message's estimate agrees with $e$, i.e. $E(L(v_j, J(L(v_i, M)))) \equiv e$

**Definition 4.1** ($v_i$ sees $v_j$ agreeing with $e$ in $M$).

$$v_i \xrightarrow[M]{\equiv, e} v_j \iff E(L(v_j, J(L(v_i, M)))) \equiv e$$

---

[5] Following the process decribed in the footnote about excluding invalid messages from the binary consensus.

And we say that a validator $v_i$ "can see $v_j$ disagreeing with estimate $e$ in a set of protocol messages $M$" if:

- $v_i$ has exactly one latest message in $M$, $L(v_i, M)$
- $v_j$ has exactly one latest message in the justification of $v_i$'s latest message, $J(L(v_i, M))$ (which we denote as $L(v_j, J(L(v_i, M))))$
- $v_j$ has a "new latest message for $v_i$" $m \in M : m \succ L(v_j, J(L(v_i, M))))$
- And this $m$ disagrees with $e$, $E(m) \not\equiv e$

**Definition 4.2** ($v_i$ can see $v_j$ disagreeing with $e$ in $M$).

$$v_i \xRightarrow[M]{\not\equiv, e} v_j \iff \exists m \in M : V(m) = v_j \wedge m \succ L(v_j, J(L(v_i, M))) \wedge E(m) \not\equiv e$$

A set of non-Byzantine nodes in $M$ *who each mutually see each other agreeing with $e$ in $M$ and also mutually can't see each other disagreeing with $e$ in $M$* are called an "$e$-clique" in $M$.

Our aim is to show that if there is an $e$-clique in $M$ with total weight $W'$, and $2 * W' > \sum_{v \in V} W(v)$, then $e$ is safe for the protocol with states $\Sigma_t$ for $t = 0$. We won't give a rigorous proof, but the idea is simple enough. If nodes in an $e$-clique see each other agreeing on $e$ and can't see each other disagreeing on $e$, then there does not exist any new message from inside the clique that will cause them to assign lower scores to $e$. Further, if the clique has more than half of the validators by weight, then no messages external to the clique can raise the scores these validators assign to a competing estimate to be higher than the score they assign to $e$. Messages from senders who are inside or outside the clique therefore cannot change the estimates of senders inside the clique, and the ideal adversary will necessarily fail.

We can also show that if $e$-clique in $M$ with total weight $W'$, then $e$ is safe as long as $2 * W' - \sum_{v \in V} W(v) > t - F(M)$, but we leave this for a future draft of this work.

9

We present the pseudocode for the "clique oracle" that uses this result to detect estimate safety:

**Data:** An estimate $e$, a set of messages $M \in \Sigma_t$
**Result:** True or False, an indicator when $e$ is safe in $M \in \Sigma_t$
$N$ = a fully connected network with undirected edges and validator names $V$ as nodes
**for** *each non-Byzantine validator, $v_i \in V$* **do**
    **for** *each non-Byzantine validator, $v_j \in V$* **do**
        **if** $v_i$ *doesn't see $v_j$ agreeing with $e$ in $M$ (not $v_i \xrightarrow[M]{\equiv, e} v_j$)* **then**
            $N$.remove_edge($(v_i, v_j)$)
        **end**
        **if** $v_i$ *can see $v_j$ disagreeing with $e$ in $M$ ($v_i \xrightarrow[M]{\not\equiv, e} v_j$)* **then**
            $N$.remove_edge($(v_i, v_j)$)
        **end**
    **end**
**end**
$N'$ = $N$.maximum_weight_fully_connected_subcomponent(weights=$W$)
clique_weight = $\sum_{v \in N'.nodes} W(v)$
total_weight = $\sum_{v \in V} W(v)$
**if** *2\*clique_weight $\leq$ total_weight* **then**
    **return** *False*
**end**
**if** *2\*clique_weight $>$ total_weight* **then**
    initial_fault_weight = $F(M)$ (this will be $\leq t$ because $M \in \Sigma_t$)
    fault_tolerance = 2\*clique_weight - total_weight
    **if** *fault_tolerance + initial_fault_weight $> t$* **then**
        **return** *True*
    **else**
        **return** *False*
    **end**
**end**

**Algorithm 2:** The "Clique Oracle", $S_t$

Now that we have an implementable safety oracle, we can equip nodes in both Casper the Friendly Binary Consensus and in Casper the Friendly Ghost with the ability to detect estimate safety. This allows nodes to *actually* rather than *only hypothetically* make (consensus safe) decisions on safe estimates.

## 5. Subjective Fault Tolerance Thresholds

The consensus safety proof can be adapted to discuss the consensus safety of decisions on safe estimates by nodes who are running any of these "correct-by-construction" consensus protocols *at different levels of fault tolerance*.

One node can execute the protocol in $\Sigma_{t_1}$ while another node can execute in $\Sigma_{t_2}$. Their decisions (which happen only on safe estimates, of course) have consensus safety as long as the union of their states exhibits less than the smallest of $t_1$ and $t_2$ faults (by weight).

This is because the protocol states in these different protocols are identical, except for the fact that one of them also includes protocol states that exhibit even more Byzantine faults than the other. If for example $t_1 < t_2$, then $\Sigma_{t_1} \subset \Sigma_{t_2}$. This means a node at $\sigma_2 \in \Sigma_{t_2}$ shares a common future with a node at $\sigma_1 \in \Sigma_{t_1}$ as long as it is not in a state $\sigma_2$ such that $F(\sigma_1 \cup \sigma_2) > t_1$.

10

Removing fault tolerance thresholds from the protocol and making them, instead, a setting that each node can configure independently has a number of attractive properties. For one, an attacker may not know the fault tolerance threshold of its targets. There are also economic benefits, but these are out of scope of this paper.[6]

# 6. Casper the Friendly Ghost with Validator Rotation

We can define a modified version of Casper the Friendly Ghost which allows for dynamically changing sets of consensus forming nodes (and/or their weights). The protocol specification works as normal, so we are lighter on the details.

Block structures are modified so that the justifications also include a weights map.

**Definition 6.1** (Blocks).

$$\text{Genesis Block} = \{\emptyset\} \times \{\emptyset\} \times (\{\emptyset\} \times \{W_{genesis}\})$$

$$\mathcal{M}_0 = \{\text{Genesis Block}\} \times V \times (\{\text{Genesis Block}\} \times \mathcal{W})$$

$$\mathcal{M}_n = \bigcup_{i=0}^{n-1} \mathcal{M}_i \times V \times (\mathcal{P}(\bigcup_{i=0}^{n-1} \mathcal{M}_i) \times \mathcal{W}))$$

$$\mathcal{M} = \{\text{Genesis Block}\} \cup \lim_{n \to \infty} \bigcup_{i=0}^{n} \mathcal{M}_i$$

We use $\mathcal{W}$ to represent the set of all weights mappings $W : V \to \mathbb{R}_+$

We redefine a block's "score" to use the weights in the parent block. The score, remember, is used to by the GHOST fork choice rule to choose between children of some block. Those children (naturally) have the same parent, and therefore will have scores determined by the latest messages from the same validators.

**Definition 6.2** (Score of a block, for Casper the Friendly Ghost with validator rotation).

$$\text{Score}(b, M) = \sum_{\substack{v \in V \\ m \in L(v,M) \\ b \downarrow E(m)}} J(E(b)).W(v) \tag{12}$$

Using "$J(m).W$" to pick out the weights from the justification of $m$.

The rest of the definitions in the protocol remain completely identical (including the estimator, the protocol states/transitions, and the safety oracle), and therefore are not restated. We have therefore specified Casper the Friendly Ghost with validator rotation, a consensus protocol which tolerates up to $t$ Byzantine faults.[7]

# 7. Liveness Considerations

Traditionally, we would like to show that the protocol "has liveness", i.e. that nodes running the consensus protocol *eventually* decide on a value. For us, the corresponding guarantee is that nodes *eventually* detect that they have a safe estimate.

The FLP impossibility (where FLP refers to the authors of [**?**]) shows that it is impossible for consensus protocols like ours (which don't use non-determinism or cryptography) to be live in an "asynchronous network,"

---

[6]Briefly, removing in-protocol fault tolerance thresholds allows every node to marginally contribute to consensus (since more fault tolerance may allow more nodes to find safety) and therefore have a positive contribution to any cartel (and thus it would not be in the cartel's interest to censor them). It also removes focal points for cartelization.

[7]We allowed completely unrestrained competition in the validator set between any block and any of its children. This means that while we always have estimate safety unless there are $t$ or more faults for nodes running $\Sigma_t$, we have not restricted the total sum of the weights to be constant (or even greater than $t$). In practice, we either restrict the sum of the weights to be constant or redefine $t$ so that it refers to a proportion of the weight.

11

**Exhibit H**
**Page 67**

which is to say, without making assumptions about the timing of message propagation (or the order of message arrival).

We have not yet made any synchrony assumptions of any kind, which is why the consensus protocols given here are asynchronously safe. Moreover, we have not said anything about when nodes *should* send protocol messages. We have instead imposed relatively loose constraints on the protocol executions that nodes can take (they can receive messages and move to any state $\sigma' \supset \sigma$ from $\sigma$, as long as $\sigma'$ does not evidence too many Byzantine faults).

This absence of a specified strategy for how validators should make blocks means that we cannot at the moment give a liveness proof. However, we present see some experimental observations where estimate safety is accomplished in the following section. These protocol executions correspond to message arrival orders which are live, and we can therefore construct reliable strategies for achieving liveness as long as nodes can coordinate timeouts in order to (eventually) produce the desired "shape" of protocol messages. In a synchronous or partially synchronous network (i.e. one where there's a known or unknown bound on the message arrival time) timeout coordination is (at least eventually) possible.

Nonetheless, liveness considerations are considered largely out of scope, and should be treated in future work.

## 8. Experimental Observations

Early prototypes of both Casper the Friendly Binary Consensus and Casper the Friendly Ghost have been implemented, and the following graphics represent observations of executions of these protocols with various message passing orders.[8]

In all of these representations, each message is represented by a node in the graph. Messages from the same validator are vertically aligned. And later messages are always displayed higher than their dependencies.



Figure 1: A Binary consensus protocol execution. Dotted lines are messages included in the justification of the later message. The label on the nodes represents the estimate of the message. A message is coloured if it has achieved some amount of Byzantine fault tolerant estimate safety, accoring to a clique oracle given its justification. The darker the colour, the more faults are tolerated by the estimate.

---

[8]The code is available at https://github.com/ethereum/cbc-casper

**Exhibit H**
**Page 69**



Figure 2: Blockchain protocol execution with 3 validators, $v_0, v_1, v_2$. Each node labeled 0 is the first message from that validator, and the nodes vertically aligned above each validator represent messages made by that validator. Dotted black lines are messages included in the justification of the later message. Blue lines represent the forkchoices of the validators given by their latest blocks. Solid grey lines are prevblock pointers (that aren't blue because they are no longer the validator's forkchoice). The red line is the result of applying GHOST to the set of messages displayed here.



Figure 3: In this execution of the blockchain consensus protocol, we observe some safe blocks. They are colour coded the same way as in the earlier, however this time they represent the blocks that are seen to be safe from the view that includes all of the nodes. In contrast, in the binary consensus we displayed safety that was detected locally.

14



Figure 4: Finally, in this execution of the blockchain consensus protocol where the validators are able to pass blocks around in a "round-robin" configuration, we observe the $\mathcal{O}(1)$ messages received per (finalized) block. This is possible because each block contributes to the consensus safety of many blocks.

15

## 9. Conclusion

We gave a brief overview of the consensus safety proof that Casper the Friendly Ghost has been derived to satisfy (in a "correct-by-construction" manner). Then we defined a binary consensus protocol (Casper the Friendly Binary Consensus) that satisfies the terms of the proof and therefore benefits from the results. We then remarkably slightly modified the binary consensus protocol to give the blockchain based consensus protocol (which can be adopted for, or even termed as sequential state machine replication).

Then we further witnessed the power of the safety proof when we showed that we can remove the fault tolerance threshold from the protocol and implement validator rotation without making significant changes to the protocol. Finally, we saw (as advertised) that it is possible for Casper the Friendly Ghost to decide on blocks with consensus safety that tolerates $t$ Byzantine faults (in an asynchronous network) with $\mathcal{O}(1)$ messages per block.

We hope this work has been educational and will lead to the development of many interesting and useful consensus protocols.

## 10. Acknowledgements

I would like to thank Nate Rush and Danny Ryan for their hard work on getting the codebase ready for release at Devcon3, for their help on this (draft) paper. Thanks to Karl Floersch, who was the first developer to work on the codebase. I'd like to thank Greg Meredith for an introduction to the "correct-by-construction" approach to protocol design, as well as for helping formalize a lot of the ideas. Finally, I'd like to thank Vitalik Buterin, with whom I have collaborated on this research from its very early stages over three years ago.

## References

[1] Sompolinsky, Y. & Zohar, A. Secure high-rate transaction processing in bitcoin (2013). URL `https://eprint.iacr.org/2013/881.pdf`.

[2] Lamport, L. The part-time parliament. *ACM Transactions on Computer Systems* **16**, 133169 (1998).

[3] Nakamoto, S. Bitcoin: A peer-to-peer electronic cash systems (2008). URL `https://bitcoin.org/bitcoin.pdf`.

[4] Paxos made moderately complex. URL `http://paxos.systems/`.

# EXHIBIT I

**Exhibit I**
**Page 73**



# RChain Documentation

## INTRODUCTION TO RCHAIN

RChain is a decentralized, economically sustainable public compute infrastructure. While the RChain design is inspired by that of earlier blockchains, it also realizes decades of research across the fields of concurrent and distributed computation, mathematics, and programming language design.

📹 **WHAT IS RCHAIN ALL ABOUT?**      📖 **RCHAIN PLATFORM ARCHITECTURE**

📖 **RCHAIN: TECHNICAL SPECIFICATIONS AND RELEASE PLANS**      **RCHAIN BLOG**

## RHOLANG

Rholang is a new language for writing smart contracts that run on the RChain platform.

The language is a reflective higher-order process calculus, based on Milner's asynchronous polyadic pi calculus. As such, it is inherently concurrent, which makes it better suited to distributed programming than languages based on Turing machines or Church's lambda calculus, which are inherently sequential.

📖 **RHOLANG SPECIFICATION**      **RHOLANG TUTORIAL**

📖 **CLARIFICATIONS ON PATTERN-MATCHING**      📹 **RHOLANG IS SIMPLE**

## WHAT IS CASPER?

Casper is a particular family of proof-of-stake algorithms with strong mathematical foundations first described by an Ethereum research group.

📖 **WHAT IS CASPER?**      📖 **CASPER FOR RCHAIN**

**CORRECT-BY-CONSTRUCTION CASPER: A VISUALIZATION FOR THE FUTURE OF**

Exhibit I
Page 74

**CORRECT-BY-CONSTRUCTION CASPER: A VISUALIZATION FOR THE FUTURE OF BLOCKCHAIN CONSENSUS**

📖 **CASPER THE FRIENDLY GHOST: A "CORRECT-BY-CONSTRUCTION" BLOCKCHAIN CONSENSUS PROTOCOL BY VLAD ZAMFIR**

## WHAT IS LADL?

LADL is a process to create spatial-behavioral type systems. Such a system not only describes the structure of datatypes, but also the behavior of the processes.

📖 **WHAT IS LADL?**   📺 **LADL ALGORITHM AND TYPE THEORY**   📖 **NAMESPACE LOGIC**

📖 **POLICY AS TYPES**   🍷 **DAO ATTACK DEEP DIVE**



f Facebook          Twitter          Github

Medium          Reddit          Telegram

Discord          Youtube          Linkedin

### Signup for our newsletter

No spam, ever.

Your email address

**SUBSCRIBE**

We won't send you spam. Unsubscribe at any time.

Powered By ConvertKit

© 2019 RChain Cooperative

**Exhibit I**
**Page 75**

Case 3:21-cv-00474-TWR-AHG   Document 56   Filed 03/08/22   PageID.1242   Page 121 of 156



**Exhibit I**
**Page 76**

# EXHIBIT J

RChain wiki  /  Consensus

    ...

# Political Capital + Casper

 Created by Michael Birch (Unlicensed)
Last updated Apr 26, 2018 by Medha Parlikar (Unlicensed)

This description is based on Vlad Zamfir's correct-by-construction consensus protocols (see papers here and here for detailed descriptions) as well as discussions with Greg Meredith and others on the RChain development team. A simulation engine based on what is described on this page is being developed. The code is available on RChain's GitHub.

- General Estimate Safety Consensus Protocols
- RChain's Estimate Safety Consensus Protocol
  - The Consensus Values
  - The Logic and Propositions
  - The Protocol's Specification
  - Economic Considerations: Incentives for earning and spending political capital
  - Slashing: Punishments for invalid blocks
  - The one free parameter in the protocol:



- Initiating the protocol: Where do the first validators and political capital come from?
- Bad Behaviour Technically Allowed in Present Protocol Specification
- Future Optimizations
- Other Notes

## General Estimate Safety Consensus Protocols

An "estimate safety consensus protocol" (the terminology will be made clear shortly) requires the following things:

1. a set of possible consensus values,

> ⊘  Error rendering macro: No valid license found for LaTeX Math addon

(i.e. we need to know what we're deciding on);

2. a logic,

> ⊘  Error rendering macro: No valid license found for LaTeX Math addon

, in which the propositions are true or false statements about elements of

> ⊘  Error rendering macro: No valid license found for LaTeX Math addon

;

3. a category,

> ⊘  Error rendering macro: No valid license found for LaTeX Math addon

, (in the mathematical sense, see [Wikipedia](#) for an overview) representing the protocol, where the objects in

> ⊘  Error rendering macro: No valid license found for LaTeX Math addon

are the protocol states and the morphisms are the protocol executions;

4. a function called the estimator which maps protocol states to propositions in the logic,

> ⊘  Error rendering macro: No valid license found for LaTeX Math addon

We say that a proposition,

> ⊘  Error rendering macro: No valid license found for LaTeX Math addon

, has estimate safety on a protocol state,

> ⊘  Error rendering macro: No valid license found for LaTeX Math addon

, if for all possible future states of

> ⊘  Error rendering macro: No valid license found for LaTeX Math addon

the estimator implies

> ⊘  Error rendering macro: No valid license found for LaTeX Math addon

. Given a few reasonable constraints on the logic and estimator (see [original paper](#) for details), we obtain the following consensus safety result: if

**Exhibit J**
**Page 79**

following consensus safety result: if



and

have a common future state then their safe estimates cannot be contradictory (i.e. if

has estimate safety on

then

cannot have estimate safety on

). Therefore, if nodes act according to the estimator, they cannot reach states with views that are irreconcilable and hence consensus is always possible. Moreover, once a node sees that a proposition is safe, it knows that proposition will remain true for the final consensus as well.

## RChain's Estimate Safety Consensus Protocol

**THIS SPECIFICATION IS NO LONGER ACCURATE. THE RESEARCH INTO THE USAGE OF POLITICAL CAPITAL SHOWED THAT IT WAS NOT NECESSARILY A GOOD IDEA. SEE Details of Proof-of-Stake in RChain FOR A MORE RECENT DESCRIPTION.**

For RChain we need to fill in the pieces of a generic estimate safety consensus protocol to meet our needs. In doing so we still retain the desired consensus safety result above.

### The Consensus Values

First the set of possible consensus values,

 Error rendering macro: No valid license found for LaTeX Math addon

, will consist of all possible block directed acyclical graphs (blockDAGs). The reason for the DAG structure as opposed to a chain structure is that multiple parent block pointers will be need for some parts of the consensus protocol. A "block" in this context will have the following attributes:

- parent block pointer(s)
- attached "political capital" (we'll get to where this comes from and what it is for shortly)
- data
- justification (pointers to other blocks the validator had seen when this block was created)

The data a block contains will depend on what sort of block it is. Most relevant to users will be blocks which contain a "schedule" of transactions that occur on the RhoVM (more details on that elsewhere). However, most relevant to the present discussion will be blocks which contain "acknowledgments" of other blocks in the DAG. These blocks play an important role in the consensus protocol, as we will soon see. The data could also enforce a "slashing condition" and thus punish validators for producing invalid blocks (as explained below).

## The Logic and Propositions

Second, we need to define the logic we use to talk about the blockDAG,

 Error rendering macro: No valid license found for LaTeX Math addon

. Here it seems to be easiest and most sensible to think about natural statements which are either true or false. For example, "block

 Error rendering macro: No valid license found for LaTeX Math addon

is in the DAG" or "block

 Error rendering macro: No valid license found for LaTeX Math addon

has parent

 Error rendering macro: No valid license found for LaTeX Math addon

". Ultimately, the statement we will be most concerned about will be the former, as this is our "fork choice rule". (For a rigorous mathematical treatment, we would need to be much more precise about the details of the logic. But the intuition above is enough for our purposes here.)

## The Protocol's Specification

Now we give a detailed specification of the protocol itself, which mathematically we think of as a category,



. The protocol states are elements from the set of triples

, where

is the intended action,

is the balance of "political capital" and

is a history of received messages. Messages consist of requests from users to run smart contracts as well as blocks from other validators. Messages which contain blocks must be cryptographically signed by the validator who created it. The protocol executions are the actions "change intent", "act", and "receive message" (as well as the "do nothing" action and any combination of the various actions, as these are the requirements for a category).

Before giving the details of how each protocol execution updates the protocol state, we need to define the estimator,

, because it is needed by the protocol. As mentioned above, the logical propositions which the estimator is most concerned with are those related to which blocks are in the DAG. I.e.

is the fork choice rule; it selects which of multiple possible alternative blocks should be selected to continue the structure. In proof-of-work blockchain protocols this corresponds to the head of the chain that has the most work put into it. Here, we use the greedy heaviest observed sub-tree (GHOST) rule, which picks the block with the highest "score" to continue the structure. The score of a block,

, with respect to a message history,

**Exhibit J**
**Page 82**

> ⊘  Error rendering macro: No valid license found for LaTeX Math addon

, is the sum of the weights of the blocks in the DAG of

> ⊘  Error rendering macro: No valid license found for LaTeX Math addon

which are the most recent message in

> ⊘  Error rendering macro: No valid license found for LaTeX Math addon

from their sender, where the weight of a block is defined (recursively) by

> ⊘  Error rendering macro: No valid license found for LaTeX Math addon

, where

> ⊘  Error rendering macro: No valid license found for LaTeX Math addon

is a parameter of the protocol,

> ⊘  Error rendering macro: No valid license found for LaTeX Math addon

are the blocks acknowledged in

> ⊘  Error rendering macro: No valid license found for LaTeX Math addon

and

> ⊘  Error rendering macro: No valid license found for LaTeX Math addon

is the amount of political capital attached to

> ⊘  Error rendering macro: No valid license found for LaTeX Math addon

. That sentence is a lot to unpack, so let's give an example.

Suppose there are 3 validators: A, B, and C. Let us take the perspective of A and suppose she has a message history which is consistent with the following diagram:

**Exhibit J**
**Page 83**

In the diagram, blocks are aligned above their creator, each is labelled with a name (for future reference) and the amount of political capital attached to the block. Arrows indicate parent block pointers; additionally, those marked with "ack" also indicate acknowledgment data of the target block is present in the source block. This message history shows that the latest message from each sender is: A - $b_6$, B - $b_5$, C - b4; therefore, only these blocks will have a non-zero score. Using the formula above, the weight of each of these blocks is: $W(b_6) = 3$, $W(b_5) = 4f^2$, and $W(b_4) = 2f$. From these, we determine the score of each by walking through the DAG and obtain $Score(b_6) = 3 + 4f^2 + 2f$, $Score(b_5) = 4f^2 + 2f$, and $Score(b_4) = 2f$. Therefore, $b_6$ has the highest score and so a future block created by A must build from $b_6$, unless she receives a new message which changes the scores.

Notice that if we look back one message (before A created $b_6$), $Score(b_5) = 4f^2 + 2f + 2$ (the +2 comes from $b_1$, which would have been A's most recent message if $b_6$ did not exist), was the highest, which is why A would have chosen to create $b_6$ on top of $b_5$. Also note that $b_3$ and $b_4$ can be thought of as the other two validators "promoting" A's block, while $b_5$ acts as a "join" of the previous two non-conflicting blocks into a single block, thus allowing the structure to continue without leaving any blocks which are in agreement behind.

Let us now return to specifying the protocol executions. The change intent protocol execution simply changes the intended action, while act triggers the current intended action. The two possible intended actions behave as follows:

- Propose - Create a schedule of transactions from one or more of the unprocessed smart contract requests in the message history. Create a block with parents based on names involved in the contract (see Namespaces for more details) and the GHOST fork choice rule (see specification above), some amount of political capital attached (chosen by validator, note that more political capital means more weight for the block, which in turn means it is more likely to be selected by the GHOST fork choice rule), the schedule created as the data, and all blocks from the message history as the justification (an optimization here would be to only include blocks that are relevant in the justification instead of all blocks).
- Acknowledge - I.e. promote or join. Choose any number of independent blocks which are the most recent message in the message history from that sender (note that one block is always an option, which would be "promoting"). Independent is defined as neither being reachable from the other through DAG

connections and any data contained in the parts of their DAGs which are not connected do not conflict. Create a block with the chosen blocks as parents, some amount of political capital (note that this could be zero and the block still has weight due to the recursive definition of weight on the acknowledgments,

but a non-zero amount could also be chosen to further increase the weight), the chosen blocks as acknowledgments in the data and all blocks from the message history as the justification (an optimization here would be to only include blocks that are relevant in the justification instead of all blocks). Note that none of the chosen blocks can have been acknowledged by the validator previously (this is verified through the block justification).

The effect of both executions on the protocol state is to add the produced block to the message history (i.e. a validator instantly receives all messages they send out to the network) and reducing the political capital balance by the amount attached to the block. Additionally, the political capital balance is increased based on what was acknowledged in the block according to the recursive formula



, where



is the amount of political capital earned by the block



. Note that the most recent message constraint prevents going back to promote old blocks to get extra political capital. The single acknowledgement only rule similarly prevents rapid "political capital mining" through repeated promotion of the same block.

The final protocol execution, receive message, is not as simple as it first appears. Of course, it adds the new message to the message history, but it is also important that the message is validated during this action. This step is necessary to ensure the integrity of the blockDAG; indeed, since this is a trustless system, all validators must independently check all the messages they receive. There are a few different things which must be validated when a new message is received:

- The message does not produce an equivocation - An equivocation is defined as a pair of messages from the same sender where neither justifies the other; that is to say that neither message appears in the justification (or recursively inside those justifications) of the other message. This is a type of Byzantine fault because it shows that the sender is behaving as if they are running two independent versions of the protocol. Otherwise, the latest message from a sender would include all past messages from that sender in its justification.
- If the message is a proposed block of transactions, then those transactions are valid - I.e. the smart contracts were not already executed by a previous block and using the transactions to update the virtual machine state succeeds without errors. E.g. a transaction which causes a double spend should be an error and thus not valid.
- If the message is a join-type acknowledgement, then the blocks which are acknowledged are all indeed independent and have not been acknowledged by the same sender previously - E.g. the same transaction is not run in more than one acknowledged block.
- If the message is a slashing block, then it does indeed correspond to a real violation.
- If the message is any sort of acknowledgement, then all blocks which are acknowledged are themselves valid - I.e. this bullet makes validation a recursive process.

If any of the above are violated, then the message is invalid, and the infraction must be reported. In this circumstance a new "slashing" block will be created which punishes the offending sender(s) of the invalid message(s).

One final piece of the protocol is a notion of finality, i.e. how do we know when a block will be in the DAG forever? Current blockchains use the depth of a block as a proxy for finality and technically no block is ever truly final. Depth of a block can be used here too to get a sense of how likely it is that a block will remain part of the

main DAG, however we can also introduce reasonable "synchrony constraints" to have true finality. A validator (or user) considers a block to be final after it has been in their message history for a time


Error rendering macro: No valid license found for LaTeX Math addon

(say 1 week for example). This means finality is relative, depending on when a message was received, but practically that does not pose much of a problem when the timeframe is sufficiently long. This does allow for the possibility of consensus failure if two nodes finalize mutually exclusive blocks, however this situation is also unlikely when the time window is long and due to the incentives discussed in the following section.


## Economic Considerations: Incentives for earning and spending political capital


As with other blockchains, the validator which proposes a block of transactions also includes some transactions reflecting the "fees" (in the form of REV) earned by the validator for performing the computation. Therefore, a validator is incentivized to ensure that a block they create remains in the main DAG, otherwise the transactions in which they were rewarded fees would be lost. The GHOST fork choice rule causes blocks with more weight to be more likely to end up in the main DAG, therefore, a validator who attaches a lot of political capital to a block they create is more likely to retain the fees they were rewarded. Thus, spending political capital when proposing blocks is economically incentivized. Moreover, since political capital is baked into the consensus protocol, the only way to earn political capital after spending it is to acknowledge other blocks. Blocks which are acknowledged by someone other than their creator (the score of a self-promoted block, with no additional political capital, is lower than the score of the original since


Error rendering macro: No valid license found for LaTeX Math addon

and GHOST only considers most recent messages) are more likely to be used to continue the DAG because they have a higher score. Thus, promoting is good for everyone since the promoter earns political capital for future use and the promoted is more likely to retain their fees. Joining is hence even more incentivized because it sums over all the benefits of individual promotions.

The benefits of incentivizing behaviour in this way are

- automatic validator rotation – since the best way to earn political capital is from what others have spent, flow of political capital (and thus ability to propose blocks) is between different validators;
- reduced forking – promoting and joining work to keep a single main DAG;
- improved liveness – promoting and joining weed out alternative forks quickly.


## Slashing: Punishments for invalid blocks


Validators who produce invalid blocks should be prevented from doing so again in the future, therefore the punishment should involve a reduction in their balance of political capital. In fact, allowing the political capital balance to go arbitrarily negative due to slashing (but not through attaching to a block, otherwise political capital would be in limitless supply) would prevent a bad validator from proposing blocks for as long as desired. However, reconciliation would always be possible in principle because the validator could still earn political capital and slowly bring their balance back above zero, if desired.

The details around what precise amounts will be deduced for various violations has not yet been worked out.

### The one free parameter in the protocol:

 Error rendering macro: No valid license found for LaTeX Math addon

### What should be the value of

 Error rendering macro: No valid license found for LaTeX Math addon

? Should it change over time depending on the number of participants in the network? These questions remain to be answered and perhaps some simulations are needed to inform those decisions.

### Initiating the protocol: Where do the first validators and political capital come from?

Since political capital is earned only through promoting blocks which already have political capital attached to them, a natural question is where the first political capital comes from. One solution is to have genesis blocks have some amount of political capital attached to them. Then all validators (regardless of when they join) have at least one block to promote in order to increase their political capital balance from the initial value of zero. The single acknowledgement rule prevents this from being exploited to gain unbounded amounts of political capital. Note that even if a validator created an infinite chain of promotion blocks stemming from the genesis then because

 Error rendering macro: No valid license found for LaTeX Math addon

, the geometric series will converge to a finite value. Moreover, the single acknowledgement rule prevents the creation of multiple such chains.

A related question is who gets to be validators? A simple answer, which is enabled by this framework is: everyone. Yes, everyone; at least, everyone that wants to. If all new users who join the network start with a political capital balance of zero then they cannot propose new blocks (at least not ones that will stick around), but they can still participate in the validation process. Or they can go on with a balance of zero as a regular user, its totally up to them. Again, since political capital can only be earned through participating in the consensus process (and bad participation is punished), we ensure that only those really interested in the network can contribute future blocks, while still leaving the option open for anyone to reach that level.

### Bad Behaviour Technically Allowed in Present Protocol Specification

- Any time you propose a block, immediately promote it yourself. This prevents others from acknowledging your proposed block directly (since only most recent messages can be acknowledged), thus reducing the amount of political capital your opponents can gain from your proposal. This does reduce the score of the branch you are building (since score only considers most recent messages and the weight of the promote block will be lower than the original proposal), therefore opening the possibility that your block will lose the fork choice rule. So, it is not yet clear under what circumstances this strategy to monopolize political capital would be successful.
- Flood the network with pointless acknowledgements, attempting to crash smaller nodes. E.g. write a script that spawns an infinite chain of acknowledgement blocks rooted at genesis; instant DoS attack. As

**Exhibit J**
**Page 87**

script that spawns an infinite chain of acknowledgement blocks rooted at genesis, instant DOS attack. As discussed above, this attack is not encouraged within the system itself, but if there is some external reason why someone wants to bring down RChain, this is a conceivable way of doing it. A simple (though inconvenient) way of getting around this would be to put require the validator to go through a captcha

of some sort before an acknowledgement can be sent out. Another option would be to have a built-in firewall of sorts that automatically blacklists another validator when this kind of attack is detected.

## Future Optimizations

- Allow join of confliting blocks, where a solution of the conflict is proposed simultaneously with the acknowledgement of the independent pieces of the blocks.

## Other Notes

- What happens when a validator leaves for several months and then returns - how is trust re-established without opening the network to attack?
  - Political capital is earned through being active in the consensus process and hence a proxy for trust. This question is a good argument for political capital to have a "half-life" of some kind. This would mean that when the validator returns they would need to re-engage with the network before regaining their previous status. How long this half-life should be is up for debate.
- Do we have a solution to the Prisoner's dilemma? Transaction receipts (in lieu of every validator validating every shard that shares cross-shard state) create a Prisoner's dilemma.
  - Prisoner's dilemma, when played as an infinitely repeated game (as it would be in this case), has an optimal strategy of cooperate by default and even forgive one defect before losing trust. We simply allow the game to play out and trustworthy namespaces will get along fine, while non-trustworthy ones are isolated from the rest of the network. We should also have at least some cross-namespace validators to ensure that one bad player does not ruin the reputation of an entire namespace.
- Is it possible to manipulate the consensus protocol to get free storage? I.e. if consensus history needs to be stored forever as proof of the consensus result, could that information be used by a client instead of paying for proper storage?
  - Possibly... Could try to avoid such situations by enforcing a normal form of the data stored in acknowledgement blocks.

casper ×

**Exhibit J**
**Page 88**

# EXHIBIT K





# Vlad Zamfir Joins the RChain Cooperative

Patrick   Sep 22, 2017 · 2 min read

The RChain Cooperative announces that Vlad Zamfir, known for his work on proof-of-stake for the Ethereum Foundation, has joined the Co-op's Board of Directors. Vlad is passionate about enabling social responsibility in technology organizations through blockchain governance.

"Being a director of the RChain cooperative is an opportunity to help a nascent blockchain community develop future-proof norms and institutions that will guarantee ongoing responsible blockchain governance. In my capacity as a director, I will firmly advocate that the RChain ecosystem's blockchain governance infrastructure prioritizes the interests of its users, the RChain community, and broader society." — Vlad Zamfir

RChain Co-op's President and RChain's architect Greg Meredith welcomes Vlad by saying, "Vlad is committed to take the best actions for the greater good. He really resonates with our mission and appreciates our correct-by-construction approach (to build a robust solution correctly the first time). It's not exactly a secret that Vlad, others, and I have actually been collaborating on Casper and sharding for over two years!" You can follow the collaboration on Casper by viewing YouTube videos of the weekly Casper Standup meetings.

Vlad says "I'm satisfied that research Greg Meredith and I have done on Casper and sharding over the last couple of years has been foundational to the RChain ecosystem.

**Exhibit K**
**Page 90**

I believe in our results and in the formal methods that make them easily defensible."
Reassuring the Ethereum community, Vlad continues "I'll (of course) continue to
contribute to the open-source/public domain development of Casper and sharding
through ongoing research, independently and as a contractor for the Ethereum
Foundation."

The news of adding Vlad Zamfir as a Board Director comes as the Co-op nears the
conclusion of its private token sale, ending September 28, 2017. More information at
https://privatesaleinfo.rchain.coop/.

About RChain Cooperative The Co-op is a Seattle, WA based organization led by Greg
Meredith, a leader in the blockchain space. Following his leadership and years of
building and developing in the decentralized platform world, RChain is creating a
platform that will transform blockchain technology and empower its users. The Co-op
is owned and controlled by its members. The platform set to release by the end of Q3
2018. More information is at www.rchain.coop.

*this is a repurposing of the official press release found at http://bit.ly/2xjngSp

## Sign up for RChain Newsletter

By RChain Cooperative

Secure. Sustainable. Scalable. Blockchain solution. Take a look.

Your email

✉ Get this newsletter

By signing up, you will create a Medium account if you don't already have one. Review our Privacy Policy for more information
about our privacy practices.

Blockchain     Proof Of Stake     Ethereum     Cryptocurrency     Technology

**Exhibit K**
**Page 91**



**Exhibit K**
**Page 92**

# EXHIBIT L

**Exhibit L**
**Page 93**

Explore

Settings

**Tweet**

**Vlad Zamfir**
@VladZamfir

Excited to help the RChain ecosystem with blockchain governance stuff :)

> **RChain Cooperative** @rchain_coop · Sep 21, 2017
> We are happy to have @VladZamfir join the RChain Cooperative as the 7th Board member. bit.ly/2xjngSp #blockchain #cryptocurrencies

7:31 AM · Sep 22, 2017 · Twitter for Android

**19** Retweets **3** Quote Tweets **50** Likes

🎀 🎀 @StopAndDecrypt · Sep 22, 2017
Replying to @VladZamfir

2

**Vlad Zamfir** @VladZamfir · Sep 22, 2017
Replying to @woutermetmening
Well I'm not in the habit of giving precise promises like this :/ but sharding/PoS ftw ;)

**Greg Heuss** @grheuss · Sep 22, 2017
Replying to @woutermetmening and @VladZamfir
If you don't have ambition you lack drive, if you lack drive, you have status quo. Aim high @rchain_coop

1

**th4s** @th4s_ · Sep 22, 2017
Replying to @VladZamfir
how is this related to your work for ethereum?

1

**Vlad Zamfir** @VladZamfir · Sep 22, 2017
You didn't even click the link, did you? ;)

1 1

Show replies

**Gerhart** @Gillenils · Sep 22, 2017

Search Twitter

**New to Twitter?**
Sign up now to get your own pers

Sign up

**Relevant people**

**Vlad Zamfir**
@VladZamfir
Absurdist, troll

**RChain Cooperativ**
@rchain_coop
Fully decentralized
communications &
maintains state by u
(Casper) RChain® is
trademark of RChai

**What's happening**

Holidays · This afternoon
**Pride Month celebrations b across the world**
Trending with #pride🏳️‍🌈, LGBTQ

Technology · Trending
**Venmo**
20.9K Tweets

Trending in United States
**READY FOR WAR**
5,506 Tweets

COVID-19 · LIVE
**COVID-19: News and upda Washington, DC**

**Bloomberg Wealth** · 1 ho
**Employees are quitting ins of giving up working from**

Show more

Terms of Service Privacy Policy
Ads info More ··· © 2021 Twit

**Don't miss what's happening**
People on Twitter are the first to know.

Log in S

**Exhibit L**
**Page 94**



Explore

Settings

Search Twitter

**Caleb Shough** @CalebShough · Sep 22, 2017
Replying to @VladZamfir
Concept look interesting, the $50,000 minimum investment looks prohibitive.

**Greg Heuss** @grheuss · Sep 22, 2017
Replying to @VladZamfir
In response to the min. $50K, RChain is being selective and seeking direct contributors hence "private token sale" broader sale maybe nxt yr
1

**Rick Dudley (afdudley.eth)** @AFDudley0 · Sep 22, 2017
Replying to @VladZamfir
Took you long enough :D
2

**Don't miss what's happening**
People on Twitter are the first to know.
Log in

# EXHIBIT M



Menu

# RChain® Hackathon Nov 7-8, 2020

**Growing communities of dapps, libraries and resources.**

**Decentralized Coordination and Governance at Scale**

**Online Qualifying Test FRIDAY, NOVEMBER 6, 2020.**

**Register at registration form**

RChain Advantage · dApp Developer APIs, Tools · RChain In Depth · RNode core scala dev · Registration and Selection · Misc

## RChain Advantage

RChain an emerging, open source, decentralized, economically sustainable public compute infrastructure. While the RChain design is inspired by that of earlier blockchains, it also realizes decades of research across the fields of concurrent and distributed computation, mathematics, and programming language design.

Exhibit M
Page 97



# dApp Developer APIs and Tools

There're APIs available for the platform that allow a person skilled in any language to develop apps.

- RNode API: rnode communicates primarily using gRPC but it also has the RNode Web API, which supports use directly from browsers, curl, etc.
- Rholang
  - Rho Blockly
  - Rholang Playground
  - Rholang cheat-sheet
  - vs-code Live Share
  - vs-code extension for Rholang
  - rholang/examples
  - genesis contracts: Casper Proof of Stake, REV Vault, MakeMint, ListOps, Either
  - Learn Rholang By Example, Rhobot.net
  - Getting started with Rholang smart contracts 1hr talk by Stay and Shikama, Jun 2018
- … more on developer.rchain.coop
- Sample problem statements you can work on or create your own

**Exhibit M**
**Page 98**

6/1/2021                                          RChain | hackathon 2020



# RChain In Depth

The RChain decentralized applications platform is powered by the *Rho Virtual Machine*, including:

- *Rholang*: an asynchronous message based concurrent language with reflection, thus supporting higher-order mobility and capability security
- *RSpace*: a key-value database supporting the storage and query of both data and code

**Exhibit M**
**Page 99**



Menu

Day 4 - RChain VM - Greg Meredith & VM Developer Team

# Rholang Foundations: Rho Calculus

RChain is an open source, emerging blockchain platform with a smart contract language called Rholang. The syntax and execution mechanism are derived directly from the rho-calculus, a variant of Milner's π-calculus. The platform is intended to support correct-by-construction smart contracts with behavioral types. It is not possible to have bytecode injection attacks. RChain is the first implementation of the Correct By Construction (CBC) Casper consensus algorithm.

Being derived from the rho-calculus, Rholang is a language in the process calculi family of languages.  Rholang is an asynchronous message based concurrent language with reflection, thus supporting higher-order mobility, like the higher-order π-calculus, but with far simpler syntax and semantics. Rholang has deep mathematical foundations making it suitable for automatic formal verification of code. In particular, Rholang is compatible with a behavioral type system that has already been shown to detect crucial bugs in the blockchain application space.

When considered in the context of RSpace, its execution mechanism and a unique key-value database supporting the storage of both data and active code, Rholang may also be seen as a next generation query language that reconciles relational query mechanisms with nosql. This means that as a smart contracting language Rholang is ideal for making blockchain a platform for data intensive applications where data is stored on chain, as well as a process modeling language, such as XLang, BEPL, or BPML.

**Exhibit M**
**Page 100**

Menu

- getting started with rholang
- LADL from the Ground Up by Mike Stay and Greg Meredith, Jun 2018
- core dev rholang tutorial
  - A Tutorial for Matching in Rholang
  - More in-depth tutorial on pattern matching
  - Casper contracts, including ListOps, Either



Get Started with Rholang Smart Contracts by Mike Stay an...

# RNode core scala dev

The core RChain platform is developed in Scala with extensive use of the cats library for pure, typeful functional abstractions.

- rchain/rchain on github

Those desiring **core platform development internships**, should preferably understand the structure and logic of the cats library (typelevel/cats) and the best practices in using it.  Also required for core platform internships: familiarity with and/or interest in Test frameworks, generative and law based testing using e.g. ScalaTest, Discipline and Test Driven Development. However, Scala expertise is not a requirement for participation in the hackathon.

# Registration and Selection Process:

1. Register your team and component individuals (all individuals in the team use the same team name) at registration form, providing the

**Exhibit M**
**Page 101**

6/1/2021                                                    RChain | hackathon 2020



github user account and github registered email account for each team member, including: generating and submitting a SEPARATE REV address for EACH TEAM MEMBER using one of the interfaces to the RChain network. The REV address will be used for rewards, prizes etc.

2. Teams may describe a problem statement they want to work on. Rchain will make available several problem statements for teams that do not have a self-created problem statement.

3. Each team member can also provide a cell phone number and the corresponding SMS email address, to receive SMS notifications and reminders.

4. All individuals participate in the **online qualification test on FRIDAY, NOVEMBER 6, 2020** that includes questions in Logic, Scala, JavaScript, Python, Rholang and Cryptography + Blockchain concepts.

5. Qualifying candidates will participate in a preliminary contest to create pull requests on github for smallish specified technical issues. Github familiarity (how Github works, making repositories, forks and feature branches, creating pull requests etc.) is required of ALLCANDIDATES.

6. Hackathon participants will be selected based on their weighted performance in the test and the github exercises

7. Teams will be formed around the problem statements, while balancing requisite team skills

8. Teams will select and finalize scope of the problem statements they will work on.

9. **Actual Hackathon on November 7-8, 2020**

10. Judgement of teams by judges

11. Prizes

12. **Opportunity for select teams and/or individuals to participate with RChain community in project based internships lasting three months to a year+**

Chat with us in our #hackathon-2020 channel on Discord (Invitation Link).

# Learning Resources

**Github**

- Getting started with GitHub
- rchain-community github organisation
- ..many other resources

**Exhibit M**
**Page 102**

**Rholang**

Menu

- [RChain Community Developer Hub](#)
- [Powerbox functions](#)
- Object Capability patterns
- [Slides & Videos](#)
- [Github: Awesome OCAPS](#)
  a Pattern Language for object capability (ocap) patterns, especially their use in secure JavaScript and Rholang.
- [RChain Boulder devcon](#)
- [2017 dev retreat](#)

**Blockchain in General**

- [Reading List - BlockChain-101](#)
- Coursera course on blockchains by SUNY Buffalo
- Coursera - AICPA Course on applications of Blockchain

**RChain Platform**

- On youtube, subscribe to the RChain channel and search on rcast for discussions of RChain applications, Governance, philosophy and future plans
- [Onboarding: the first week](#)
- [Reading List](#)
- [TestNet REV Faucet](#)

**Books on Scala**

- Functional Programming Simplified by Alvin Alexander (focus on the performant immutable data structures)
- Functional Programming in Scala,
- Scala for the impatient (you can skip the chapters related to objects),

**Examples (there are several others on the net):**

- [Github: A translation of the code examples from "Unbounded Spigot Algorithms for the Digits of Pi" (Gibbons, 2006) from Haskell to Scala.](#)
- [PDF: Unbounded Spigot Algorithms for the Digits of Pi by Jeremy Gibbons](#)
- [Github: RChain Education: Functional Effects for Scala](#)
- [Video: RChain Education Session: auction bidding & Scala development](#)

**Exhibit M**
**Page 103**

Menu

[Github: RChain Education: Introduction to tagless-final style in Scala: higher-kinded types](#)
[Video: RChain education: Introduction to tagless-final style in Scala: higher-kinded types](#)
- [Video: RChain Education: compiling RNode](#)
- [Voting in Rholang (RVote)](#)

**RChain Education: Implementation of Simple Rholang language**

- [Github: SimpleRholang.scala](#)
- [Video: RChain Education - Implementation of Simple Rholang language](#)

---

# Previous Hackathons:

- [RSong at MIT Media Lab](#) OpenMediaLegalHack - #hack4music on October 25, 2018



copyright © 2021 RChain Cooperative All rights reserved
RChain and REV are registered trademarks of RChain Cooperative
[Privacy terms and conditions](#)

**Exhibit M**
**Page 104**

# EXHIBIT N

# Coordination Technology LTD

Attn: Vlad Zamfir, 2nd Floor, The John Compton Building, William
Peter Boulevard, Castries, Saint Lucia

vldzmfr@gmail.com

INVOICE for speaking and participation provided on:
09-09-2016 – 09-11-2016

**Synereo LTD**

**INVOICE DATE: 30 September, 2016**

**BALANCE DUE: Upon Receipt**

# 3,000 USD

| Item Description | Quantity | Price Per | Total |
|---|---|---|---|
| Speakers fee | 1 | 2,000 USD | 2,000 USD |
| Travel expenses | 1 | 1,000 USD | 1,000 USD |
| | | | |
| | | | |
| | | | |
| | | | |
| | | TOTAL | 3,000 USD |

Payment address:  REDACTED

# EXHIBIT O

| | |
|---|---|
| **To:** | CasperLabs, LLC (gloria@hansantos.com) |
| **Subject:** | U.S. TRADEMARK APPLICATION NO. 88300598 - CASPERLABS - CSP.TM0009US |
| **Sent:** | 4/30/2019 5:00:16 PM |
| **Sent As:** | ECOM102@USPTO.GOV |
| **Attachments:** | |

### UNITED STATES PATENT AND TRADEMARK OFFICE (USPTO)
### OFFICE ACTION (OFFICIAL LETTER) ABOUT APPLICANT'S TRADEMARK APPLICATION

**U.S. APPLICATION
SERIAL NO.** 88300598

**MARK:** CASPERLABS

# *88300598*

**CORRESPONDENT
ADDRESS:**
  GLORIA
STEINBERG
  HAN SANTOS,
PLLC
  500 UNION STREET
SUITE 800
  SEATTLE, WA
98101

**CLICK HERE TO RESPOND TO THIS
LETTER:**
http://www.uspto.gov/trademarks/teas/response_forms.jsp

VIEW YOUR APPLICATION FILE

**APPLICANT:**
CasperLabs, LLC

**CORRESPONDENT'S
REFERENCE/DOCKET
NO:**
  CSP.TM0009US

**CORRESPONDENT E-
MAIL ADDRESS:**
  gloria@hansantos.com

### OFFICE ACTION

### STRICT DEADLINE TO RESPOND TO THIS LETTER

TO AVOID ABANDONMENT OF APPLICANT'S TRADEMARK APPLICATION, THE USPTO MUST RECEIVE APPLICANT'S COMPLETE RESPONSE TO THIS LETTER **WITHIN 6 MONTHS** OF THE ISSUE/MAILING DATE BELOW.  A RESPONSE TRANSMITTED THROUGH THE TRADEMARK ELECTRONIC APPLICATION SYSTEM (TEAS) MUST BE RECEIVED BEFORE MIDNIGHT **EASTERN TIME** OF THE LAST DAY OF THE RESPONSE PERIOD.

**ISSUE/MAILING DATE: 4/30/2019**

**TEAS PLUS OR TEAS REDUCED FEE (TEAS RF) APPLICANTS – TO MAINTAIN LOWER FEE, ADDITIONAL REQUIREMENTS MUST BE MET, INCLUDING SUBMITTING DOCUMENTS ONLINE:** Applicants who filed their application online using the lower-fee TEAS Plus or TEAS RF application form must (1) file certain documents online using TEAS, including responses to Office actions (see TMEP §§819.02(b), 820.02(b) for a complete list of these documents); (2) maintain a valid e-mail correspondence address; and (3) agree to receive correspondence from the USPTO by e-mail throughout the prosecution of the application.  *See* 37 C.F.R. §§2.22(b), 2.23(b); TMEP §§819, 820.  TEAS Plus or TEAS RF applicants who do not meet these requirements must submit an additional processing fee of $125 per class of goods and/or services.  37 C.F.R. §§2.6(a)(1)(v), 2.22(c), 2.23(c); TMEP §§819.04, 820.04.  However, in certain situations, TEAS Plus or TEAS RF applicants may respond to an Office action by authorizing an examiner's amendment by telephone or e-mail without incurring this additional fee.

### Exhibit O
### Page 108

The referenced application has been reviewed by the assigned trademark examining attorney.  Applicant must respond timely and completely to the issue(s) below.  15 U.S.C. §1062(b); 37 C.F.R. §§2.62(a), 2.65(a); TMEP §§711, 718.03.

**Search Results**

The trademark examining attorney has searched the Office's  database of registered and pending marks and has found no conflicting marks that would bar registration under Trademark Act Section 2(d).  TMEP §704.02; *see* 15 U.S.C. §1052(d).

**Identification Unacceptable In Part-Indefinite Wording**

The wording "Cryptocurrency services, namely, a digital currency or digital token, incorporating cryptographic protocols, used to operate and build applications and blockchains on a decentralized computer platform and as a method of payment for goods and services" in the identification of services is indefinite and must be clarified because it does not clearly specify any goods or services because it states only a digital currency used as a payment method; the common commercial or generic name or type of the goods and/or services must be further specified.  *See* 37 C.F.R. §2.32(a)(6); TMEP §1402.01.  Applicant must amend this wording to further specify the common commercial or generic name or type of the goods and/or services.  *See* TMEP §1402.01.  For example, the wording "Cryptocurrency services, namely, providing on-line non-downloadable computer software for use as a cryptocurrency wallet comprising a digital currency or digital token, incorporating cryptographic protocols, used to operate and build applications and blockchains on a decentralized computer platform and as a method of payment for goods and services" is acceptable in Class 42.  If applicant adopts the suggested amendment of the identification of services, then applicant must amend the classification to International Class 42.  *See* 37 C.F.R. §§2.32(a)(7), 2.85; TMEP §§805, 1401.

The wording " *Cryptocurrency exchange services; Cryptocurrency payment processing*" is acceptable as filed in Class 36.

The wording " *Computer software for managing cryptocurrency transactions using blockchain technology; Computer software platforms for developing, building, and operating distributed applications; Computer software platforms for blockchains; Computer software for use as a cryptocurrency wallet*" is acceptable as filed in Class 9.

The wording " *Technological consulting in the field of cryptocurrency; Design and development of computer software for decentralized computing using blockchain technology; Providing on-line non-downloadable computer software for use as a cryptocurrency wallet*" is acceptable as filed in Class 42.

Applicant's  goods and/or services may be clarified or limited, but may not be expanded beyond those originally itemized in the application or as acceptably amended.  *See* 37 C.F.R. §2.71(a); TMEP §1402.06.  Applicant may clarify or limit the identification by inserting qualifying language or deleting items to result in a more specific identification; however, applicant may not substitute different goods and/or services or add goods and/or services not found or encompassed by those in the original application or as acceptably amended.  *See* TMEP §1402.06(a)-(b).  The scope of the goods and/or services sets the outer limit for any changes to the identification and is generally determined by the ordinary meaning of the wording in the identification.  TMEP §§1402.06(b), 1402.07(a)-(b).  Any acceptable changes to the goods and/or services will further limit scope, and once goods and/or services are deleted, they are not permitted to be reinserted.  TMEP §1402.07(e).

For assistance with identifying and classifying goods and services in trademark applications, please see the USPTO's  online searchable *U.S. Acceptable Identification of Goods and Services Manual*.  *See* TMEP §1402.04.

If applicant does not respond to this Office action within the six-month period for response, the following services in International Class 36 will be deleted from the application: Cryptocurrency services, namely, a digital currency or digital token, incorporating cryptographic protocols, used to operate and build applications and blockchains on a decentralized computer platform and as a method of payment for goods and services.  The application will then proceed with all other goods and services currently specified in the application in Classes 9, 36 and 42.  *See* 37 C.F.R. §2.65(a)-(a)(1); TMEP §718.02(a).

Please call or email the assigned trademark examining attorney with questions about this Office action.  Although the trademark examining attorney cannot provide legal advice or statements about applicant's rights, the trademark examining attorney can provide applicant with additional explanation about the refusal(s) and/or requirement(s) in this Office action.  *See* TMEP §§705.02, 709.06.  Although the USPTO does not accept emails as responses to Office actions, emails can be used for informal communications and will be included in the application record. *See* 37 C.F.R. §§2.62(c), 2.191; TMEP §§304.01-.02, 709.04-.05.

Ferraiuolo, Dominic
/DominicJFerraiuolo/
Examining Attorney, U.S.P.T.O.
Law Office 102
tel:  571-272-9156

**Exhibit O**
**Page 109**

fax: 571-273-9102
email: dominic.ferraiuolo@uspto.gov

**TO RESPOND TO THIS LETTER:**  Go to http://www.uspto.gov/trademarks/teas/response_forms.jsp.  Please wait 48-72 hours from the issue/mailing date before using the Trademark Electronic Application System (TEAS), to allow for necessary system updates of the application. For *technical* assistance with online forms, e-mail TEAS@uspto.gov.  For questions about the Office action itself, please contact the assigned trademark examining attorney.  **E-mail communications will not be accepted as responses to Office actions; therefore, do not respond to this Office action by e-mail.**

**All informal e-mail communications relevant to this application will be placed in the official application record.**

**WHO MUST SIGN THE RESPONSE:**  It must be personally signed by an individual applicant or someone with legal authority to bind an applicant (i.e., a corporate officer, a general partner, all joint applicants).  If an applicant is represented by an attorney, the attorney must sign the response.

**PERIODICALLY CHECK THE STATUS OF THE APPLICATION:**  To ensure that applicant does not miss crucial deadlines or official notices, check the status of the application every three to four months using the Trademark Status and Document Retrieval (TSDR) system at http://tsdr.uspto.gov/.  Please keep a copy of the TSDR status screen.  If the status shows no change for more than six months, contact the Trademark Assistance Center by e-mail at TrademarkAssistanceCenter@uspto.gov or call 1-800-786-9199.  For more information on checking status, see http://www.uspto.gov/trademarks/process/status/.

**TO UPDATE CORRESPONDENCE/E-MAIL ADDRESS:**  Use the TEAS form at http://www.uspto.gov/trademarks/teas/correspondence.jsp.

| | |
|---|---|
| **To:** | CasperLabs, LLC (gloria@hansantos.com) |
| **Subject:** | U.S. TRADEMARK APPLICATION NO. 88300598 - CASPERLABS - CSP.TM0009US |
| **Sent:** | 4/30/2019 5:00:18 PM |
| **Sent As:** | ECOM102@USPTO.GOV |
| **Attachments:** | |

## UNITED STATES PATENT AND TRADEMARK OFFICE (USPTO)

## <u>IMPORTANT NOTICE REGARDING YOUR<br>U.S. TRADEMARK APPLICATION</u>

USPTO OFFICE ACTION (OFFICIAL LETTER) HAS ISSUED
ON **4/30/2019** FOR U.S. APPLICATION SERIAL NO. 88300598

Please follow the instructions below:

**(1) TO READ THE LETTER:** Click on this link or go to http://tsdr.uspto.gov, enter the U.S. application serial number, and click on "Documents."

The Office action may not be immediately viewable, to allow for necessary system updates of the application, but will be available within 24 hours of this e-mail notification.

**(2) TIMELY RESPONSE IS REQUIRED:** Please carefully review the Office action to determine (1) how to respond, and (2) the applicable response time period. Your response deadline will be calculated from **4/30/2019** (*or sooner if specified in the Office action*). A response transmitted through the Trademark Electronic Application System (TEAS) must be received before midnight **Eastern Time** of the last day of the response period. For information regarding response time periods, see http://www.uspto.gov/trademarks/process/status/responsetime.jsp.

**Do NOT hit "Reply" to this e-mail notification, or otherwise e-mail your response** because the USPTO does NOT accept e-mails as responses to Office actions. Instead, the USPTO recommends that you respond online using the TEAS response form located at http://www.uspto.gov/trademarks/teas/response_forms.jsp.

**(3) QUESTIONS:** For questions about the contents of the Office action itself, please contact the assigned trademark examining attorney. For *technical* assistance in accessing or viewing the Office action in the Trademark Status and Document Retrieval (TSDR) system, please e-mail TSDR@uspto.gov.

## <u>WARNING</u>

**Failure to file the required response by the applicable response deadline will result in the ABANDONMENT of your application.** For more information regarding abandonment, see http://www.uspto.gov/trademarks/basics/abandon.jsp.

**PRIVATE COMPANY SOLICITATIONS REGARDING YOUR APPLICATION:** Private companies **not** associated with the USPTO are using information provided in trademark applications to mail or e-mail trademark-related solicitations. These companies often use names that closely resemble the USPTO and their solicitations may look like an official government document. Many solicitations require that you pay "fees."

Please carefully review all correspondence you receive regarding this application to make sure that you are responding to an official document from the USPTO rather than a private company solicitation. All <u>official</u> USPTO correspondence will be mailed only from the "United States Patent and Trademark Office" in Alexandria, VA; or sent by e-mail from the domain "@uspto.gov." For more information on how to handle private company solicitations, see http://www.uspto.gov/trademarks/solicitation_warnings.jsp.

**Exhibit O**
**Page 111**